Argued and submitted September 18, reversed and remanded
December 26, 2013

In the Matter of J. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. M.,
*Appellant.*

Clackamas County Circuit Court
110851J;
Petition Number 110851J01;
A153854 (Control)

In the Matter of S. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. M.,
*Appellant.*

Clackamas County Circuit Court
110852J;
Petition Number 110852J01;
A153855

317 P3d 402

Kimberlee Petrie Volm, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Cecil A. Reniche-Smith, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Father appeals from a judgment of the juvenile court after a permanency hearing, assigning error to the court's denial of his motion to dismiss the jurisdictional petition and to the court's change in the permanency plan for his two young children, J and S, from reunification to adoption. We reverse.

The historical facts are undisputed. J was born on November 6, 2008, and S was born on August 5, 2011. The Department of Human Services (DHS) has been involved with the family and has provided services at least since 2008, when the agency began making assessments of mother based on reports of neglect of J.[1] At the time of the permanency hearing, the children had been in substitute care for 18 months.

On August 15, 2011, police responded to a report of child abuse at father's home. Father admitted to police officers that he had disciplined J several times by hitting him on the legs with one-quarter-inch diameter rubber tubing. He explained that he did so because he was impatient and J was "out of control." Father further explained that he used rubber tubing because it did not leave marks and because he was concerned that using his hand might cause injury. He told police that physical discipline is supported by biblical scripture. Father was charged with assault in the third degree and criminal mistreatment in the first degree, and taken into custody. At that time, the children were placed in protective custody because of concerns that mother, who is developmentally disabled, was not able to care for them.

In November 2011, the juvenile court assumed jurisdiction of J and S, based on allegations that (1) father had used inappropriate discipline on J; (2) as a result, both children were at risk of harm; (3) father needed help to

---

[1] Mother and father have since divorced, and mother is not involved in this appeal.

learn appropriate discipline techniques; and (4) mother was unable to protect the children from father's actions.[2]

After assuming jurisdiction, DHS provided father with a parenting trainer, who assisted him in reevaluating his views regarding physical discipline. Father regularly attended visits with the children and completed a parenting-education class with a grade of 105.3 percent. Despite that high level of participation, DHS noted that, during visits, father did not discipline J, instead allowing DHS staff or the foster parent to intervene and manage J's behavior.

In early 2012, father met with Dr. Miller for a psychological evaluation. Miller reported that father, who was then age 60, lacked insight into the effects of physical punishment on his children. He noted that father deflected personal responsibility for any abuse by stating that he now "understands the law." In Miller's view, father is "likely to comply on the surface with rules and regulations as long as he is being watched but will regress to former patterns of behavior as soon as the spot light is turned off." Miller stated that "father is not likely to provide a safe * * * environment for his children. Old patterns of behavior will continue as soon as authorities leave." Miller testified that father lacked the emotional capacity to meet his children's needs and that it was likely that he would revert to inappropriate corporal punishment when the children are no longer subject to the wardship.

Thus, Miller was largely pessimistic about father's ability to safely parent. He nonetheless opined that,

"if there is a chance that [father] could step into a healthy parent role, he would need to commit himself to a comprehensive and rigorous Dialectic Behavior Therapy Program [(DBT)] and graduate with a good recommendation. * * * Otherwise, [father] should allow his children to be raised

---

[2] As relevant, father stipulated to the following allegations of the amended dependency petition:

"a. Father uses inappropriate discipline to respond to the child's misbehavior, which places the child at risk of harm.

"b. Father needs the assistance of a child welfare agency to learn safe and appropriate parenting techniques without which the child is at risk of harm."

by someone who has the emotional capacity to give the boy and girl what they need."

Miller testified that, in order to be effective, DBT therapy would need to continue for a year or more, and that he was not optimistic about father's ability to follow through with or change through DBT.

In June 2012, father began individual DBT treatment and counseling with Stokes at Clackamas County Behavioral Health (CCBH). However, father was terminated from those services in September 2012, after CCBH determined that it could do no more for father, because "there was a lack of insight and appeared to be an inability to take the material and to use it in his life." With respect to corporal punishment, Stokes reported that she and father "agreed to disagree": Stokes believed that corporal punishment was never justified, while father believed that, in some circumstances, it was.

Father testified at the hearing that, since he began attending counseling and parenting classes, his views regarding discipline have changed and that, although he still believes that some physical discipline is an option under Christian scriptures, he would not use it, because the line between what is appropriate or legally permissible and what is not, is a close one, and he did not want to risk crossing that line and, as a consequence, losing his children. He also stated that physical discipline had not been effective with J and that, in the future, his discipline strategy would include patience, talking, and redirection. He testified that he would never use physical punishment with S, a girl, because girls must be disciplined differently. When asked by children's counsel about his earlier statements to police that scripture supported the use of physical punishment, father testified:

> "A. I think the most recent readings I have had would say that the idea of strength and standing firm, not being wishy-washy with your child, not saying you can't do that and immediately letting them do it, it would be like if you said—you can't use the car, and they drive off with it, and you don't say anything about it. So, yes, my understanding on that has changed. Definitely my understanding of how the law applies. I know the statutes say that physical

discipline is the law—is that also your understanding of Oregon statutes?

"Q. I just heard a lot of words. Let me ask you one more time. Do you believe that the Bible supports corporal punishment?

"A. I suppose I have been thinking about that, and it is no.

"Q. Okay. And my other question is what changed? I'm not sure I understood the answer to that.

"A. Further study in what those words in the Bible mean, plus the application of current Oregon law. You know, I have to look at it emotionally. I have to look at it reasonably. I think it has been said that I have intelligence and develop rational reasoning, and if no other thing, the rational reasoning of obeying the law is going to be present there if you don't believe that emotionally I have changed."

At the conclusion of the hearing, father sought to dismiss the wardship, and DHS sought a change in the permanency plan from reunification to adoption. The juvenile court took father's motion under advisement but ultimately rejected it, finding that father had not made sufficient progress toward meeting expectations set forth in the services agreement and that the children could not safely be returned to his care.

As for the permanency plan, the court found that DHS had made reasonable efforts. The court further found that the evidence did not support a determination under ORS 419B.476(4)(c) and (5)(c) that further efforts by DHS would make it possible for the children safely to return home within a reasonable time. The court changed the permanency plan from reunification to adoption, finding that none of the circumstances described in ORS 419B.498(2) applied. The findings appear only on a check-the-box judgment form; the court did not provide oral or written explanations of its reasoning.

On appeal, father assigns error to the juvenile court's denial of his motion to dismiss, as well as to the determinations relevant to the change of the permanency plan to adoption.[3] We first address the juvenile court's ruling on father's motion to dismiss.

---

[3] Father does not make any separate arguments relating to S.

ORS 419B.100(1) grants a juvenile court jurisdiction over a child "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others." A wardship cannot continue if the jurisdictional facts on which it was based have ceased to exist. *Dept. of Human Services v. D. M.*, 248 Or App 683, 685, 275 P3d 971 (2012).

Recently, in *D. M.*, 248 Or App at 686, and again in *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 635, 310 P3d 1186 (2013), this court held that, when the court's continued jurisdiction is at issue, DHS has the burden of showing that the conditions that were originally found to endanger the child persist. To satisfy that burden, DHS must show, by a preponderance of the evidence, that the factual bases for jurisdiction persist to the degree that they pose a current threat of serious loss or injury that is reasonably likely to be realized. *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011). Father contends that DHS had the burden to show that, if jurisdiction were terminated, it is likely that father would use inappropriate discipline techniques that would expose the children to a threat of serious harm, and that DHS failed to adduce such evidence.

DHS responds that Miller's psychological evaluation as a whole, including the existence of the personality disorder, serves, along with other evidence, to support DHS's assertion that, despite father's testimony, he has not absorbed the instruction and guidance regarding parental discipline and safe parenting techniques, and, for that reason, is not likely to change his behavior to ameliorate the conduct that led to the children's removal, which includes a risk that father will harm J through the use of inappropriate discipline.

DHS cites several facts that it asserts support the inference that father had not made sufficient progress in ameliorating the conditions that justified DHS taking jurisdiction, that is, father's use of inappropriate discipline on J and father's need to learn safe and appropriate parenting techniques to avoid a risk of harm. The facts cited by DHS in its brief and at oral argument are the following: (1) Miller testified that father lacks the empathy and emotional

capacity to parent appropriately; (2) father has not internalized the norm limiting corporal punishment and, for that reason, will regress to his former modes of discipline if the children are returned to him; (3) at supervised visits, father was unwilling or unable to impose discipline on the children; instead, he deferred to supervisors or foster parents; and (4) father brought inappropriately complex meals to the supervised visits. From those facts, DHS contends, the trial court correctly determined that father's progress in ameliorating the jurisdictional conditions was insufficient and return of the children to him would be likely to pose a threat to the children's safety.

On appeal of a dependency judgment, when we do not review *de novo*,

> "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome."

*Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). ORS 19.415(3)(b); ORAP 5.40(8)(c). We readily accept that there is evidence that father has not learned appropriate discipline techniques. It does not follow, however, that that evidence supports the inference that, according to DHS, justifies the trial court's decision—that is, that father, despite his assertions, will resume the infliction of inappropriate corporal punishment on J and for that reason poses a risk of harm. In *N. P.* terms, that inference is not a "permissible" one.

Our reasoning is as follows. The primary fact on which DHS relies is that, according to Miller and Stokes, father's failure to internalize the social norms against inappropriate corporal punishment implies that he is unlikely to conform to those norms. We reject that implication. The dispositive question in this case is not what father believes, but what he—at the time of the hearing—is likely to *do*. Put another way, the state does not interfere with a parent's right to raise his children on the basis of a person's values unless and until those values manifest themselves in conduct, or are likely to do so. Although we do not question the

assumption that a person is more likely to conform his or her conduct to societal norms that he or she has internalized and adopted as his or her own, that is a far cry from accepting the premise that a person is likely to deviate from unassimilated norms. We can accept that a person who believes that it is unsafe to drive more than 65 miles per hour on a rural interstate highway is *more* likely than a nonbeliever to observe a 65 mile per hour speed limit. That does not justify an inference that the nonbeliever is *likely* to drive faster than the limit.

In sum, we conclude that the facts and inferences that DHS is entitled to rely on do not satisfy its burden of establishing that, at the time of the hearing, father—contrary to his own assertion, self-assessment, and outstanding completion of a parent education class—poses a current threat of serious loss or injury that is reasonably likely to be realized.[4]

For the same reason that we conclude that the evidence is legally insufficient to support the juvenile court's finding that father has not ameliorated the proven bases for jurisdiction, we conclude that the evidence is legally insufficient to support the juvenile court's finding that father has not made sufficient progress to allow the children to be returned home safely.

Reversed and remanded.

---

[4] Our conclusion does not foreclose the possibility that a future petition alleging what the petition in this case did not—*i.e.*, that father is psychologically unable to safely parent the children—would result in a different outcome.