Submitted September 3, reversed and remanded with instructions to terminate the wardship and vacate the guardianship October 21, 2015

In the Matter of T. J. T.,
a Child.

L. D.
and C. D.,
*Respondents,*

*v.*

T. J. T.,
*Appellant.*

Yamhill County Circuit Court
J110571;
Petition Number 00199702;
A159069

360 P3d 746

Angela Sherbo argued the cause and filed the brief for appellant.

No appearance for respondents.

Before Lagesen, Presiding Judge, and Nakamoto, Judge, and Garrett, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

In this juvenile dependency case, ward appeals the juvenile court's order denying ward's motion to dismiss jurisdiction, terminate wardship, and vacate the guardianship. He assigns error to all three of the court's rulings. In 2001, the juvenile court took jurisdiction over ward and his younger sister and half-brother when ward was six years old. Two years later, the court appointed ward's aunt and uncle (guardians) as his legal custodians and guardians. In 2015, at the time of the combined guardianship review and jurisdictional hearing leading to this appeal, ward was 19 years old.

In his first assignment of error, ward contends that the juvenile court should have dismissed jurisdiction because guardians failed to prove that the facts that gave rise to jurisdiction to persist. That assignment challenges whether the proponents of wardship—in this case, guardians—met their burden to show that the factual bases for jurisdiction "persist to the degree that they pose a current threat of serious loss or injury that is reasonably likely to be realized." *Dept. of Human Services v. J. M.*, 260 Or App 261, 267, 317 P3d 402 (2013). We resolve the appeal on ward's first assignment of error and conclude that the court should have dismissed jurisdiction. That conclusion necessarily resolves ward's second and third assignments of error, concerning the juvenile court's refusal to terminate the wardship and to vacate the guardianship, in ward's favor.[1] Accordingly, we reverse and remand with instructions to dismiss jurisdiction, terminate the wardship, and vacate the guardianship.

Ward does not request that we exercise our discretion to undertake *de novo* review, ORS 19.415(3)(b) (providing for discretionary *de novo* review of certain equitable actions), and we decline to do so. *See* ORAP 5.40(8)(c) (stating that we exercise *de novo* review "only in exceptional cases"). On appeal, when reviewing a juvenile court's jurisdictional determination, "we view the evidence, as supplemented and buttressed by permissible derivative inferences,

---

[1] Guardians have not appeared on appeal, and, pursuant to ORAP 5.60, the matter was submitted on its merits as to them.

in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013); *see also Dept. of Human Services v. D. H.*, 269 Or App 863, 865-66, 346 P3d 527 (2015) (applying standard). We review the juvenile court's conclusions for legal error, and we are bound by its findings of historical fact unless there is no evidence to support those findings. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010).

## I. FACTS

The following facts are taken from the juvenile court's findings, as supported by evidence in the record, and supplemented with procedural or undisputed facts as needed.

A. *Earlier Juvenile Court Proceedings Leading to the Guardianship*

In 2001, the Department of Human Services (DHS) removed ward, who was six years old, and his younger sister and half-brother from mother's custody and filed a petition for the juvenile court to assume jurisdiction over the children. Shortly after, ward and his sister were placed with guardians.

At the 2001 jurisdictional hearing, mother stipulated to the following six bases for jurisdiction:

"The said children's conditions and circumstances are such to endanger the welfare of the children, to wit: [1.] The children's mother * * * has failed to protect the children from contact with [MC, mother's then partner,] and father of her youngest child * * * who has physically abused [ward] and [ward's sister]. [2.] DHS has founded physical abuse of [ward] and [ward's sister] on four occasions. Two incidents of physical abuse by [MC] and two separate [incidents] of physical abuse by [mother]. * * * [3. Mother] witnessed [ward] being injured and did not protect him. [4.] She endangered the children further by protecting [MC], hiding the children and lying about their whereabouts during the DHS/LEA investigation. * * * [5. Ward] has special educational, medical and counseling needs. * * * [6. F]ather of [ward] and [ward's sister], is a convicted, unsuccessfully

treated sex offender. [Father] is allowed no contact with children."

The juvenile court exercised jurisdiction over the children based on the six stipulated bases. The court committed ward and his siblings to the legal custody and guardianship of DHS. The court also ordered mother and MC to actively participate in and to complete certain counseling and parenting services.

In 2002, the juvenile court changed the permanency plan from reunification to guardianship for ward and his sister, determining that DHS had made reasonable efforts to make it possible for the children to safely return home by providing mother and MC with various services but that neither placement with the parents nor adoption was appropriate because the children were "extremely traumatized and they ha[d] significant mental health and behavioral issues[.]" The record on appeal is unclear regarding the nature of those issues and the nature of ward's educational, medical, and counseling needs that existed when the court assumed jurisdiction in 2001.

In 2003, DHS filed a motion for protective supervision and to appoint legal custodians and guardians under *former* ORS 419B.370 (2003), *renumbered as* ORS 419B.372 (2013).[2] The juvenile court held a second permanency hearing, considered DHS's motion, and concluded that, while ward and his sister would remain under the jurisdiction of the court, guardians would have legal custody and guardianship of the children as an incident of wardship, in lieu of DHS.

Specifically, the court found that the children's mental health and behavioral needs had not significantly

---

[2] *Former* ORS 419B.370 (2003) provided, in part:

"(1) When the court grants legal custody to [DHS], it may also grant guardianship of the ward to the department, to remain in effect solely while the ward remains in the legal custody of the department.

"*(2) When the court grants legal* custody to a private institution or agency or *to a suitable person* or entity, *the court may grant guardianship of the ward* to the private institution or agency to which the ward is committed *or to the suitable* person or entity *if it appears necessary to do so in the interests of the ward.*"

(Emphases added.)

changed since the first permanency hearing and that the children could not be safely returned to mother's custody. The court also found that ward and his sister could not be safely returned to their father because he was incarcerated pending resolution of sexual-abuse charges. The court determined that ward's aunt and uncle were suitable guardians for the children because they had provided foster care for them since 2001 and had provided for the children's mental health and behavioral needs. The court concluded that it was in the best interests of the children to be placed under the protective supervision of the court under ORS 419B.331.[3] It granted guardians legal custody of the children and appointed them as their legal guardians as an incident of custody. Contemporaneously, the court removed DHS as legal custodian and guardian of the children. Lastly, the court ordered guardians to provide an annual written report regarding the children to the court and to DHS.

B.  *The 2015 Combined Guardianship Review and Jurisdictional Hearing*

In 2014, guardians received a letter from the court stating that their last guardianship report had been filed in 2012, noting that both ward and his sister were over 18, and offering that, "[i]f you would like to have the guardianships terminated prior to their 21st birthdays you may contact the court and make that request." Shortly after that, guardians filed an annual report.

In their report, guardians reported problems with ward and asked the court to set a guardianship review

---

[3]  ORS 419B.331 provides:

"When the court determines it would be in the best interest and welfare of the ward, the court may place the ward under protective supervision. The court may direct that the ward remain in the legal custody of the ward's parents or other person with whom the ward is living, or the court may direct that the ward be placed in the legal custody of some relative or some person maintaining a foster home approved by the court, or in a child care center or a youth care center authorized to accept the ward. The court may specify particular requirements to be observed during the protective supervision consistent with recognized juvenile court practice, including but not limited to restrictions on visitation by the ward's parents, restrictions on the ward's associates, occupation and activities, restrictions on and requirements to be observed by the person having the ward's legal custody, and requirements for visitation by and consultation with a juvenile counselor or other suitable counselor."

hearing. Under the section titled "WARD'S WELL-BEING," guardians noted that ward was autistic. In addition, guardians wrote that ward lacked social skills, common sense, and reasoning. They indicated that ward was not living in their home and that he had stayed with his mother for a couple of months. Guardians also noted that ward had also stayed with MC, who had given ward alcohol. Guardians suggested that the guardianship "should not" continue for the following reasons: "lack of help from the state; not holding him accountable for the crimes he committed as a minor.—Recommend we assist with his financial spending."

In addition to the annual report, guardians submitted a letter to the court, expressing their concerns about "the choices [ward] is making" and asking for the court's help "in getting [ward] placed in an assisted living group home, for not only his safety, but also the safety of others." Their letter to the court concluded,

"[i]t is clear that [ward] needs to be placed in a situation that has assisted living. He clearly needs someone to make sure he gets to appointments, takes his medication as prescribed and not in his possession, and that he eats daily. [Ward] is crying out for help, we have done everything we can, and are asking the courts for assistance in placing [ward] in an assisted living group home to keep himself and those around him safe. We were informed today * * * that he is now living with his abuser, [MC]—[ward] is not in his right mind, or thinking clearly—he needs more help than we can provide."

The court scheduled a guardianship review hearing and appointed counsel for ward. Ward's counsel filed a motion to dismiss jurisdiction, terminate the wardship, and vacate the guardianship. Ward notified the required parties, including DHS.

At the combined guardianship review and motion hearing, ward and one of his guardians testified. When questioned by the court about whether the guardianship should continue, guardian testified that, although ward was 18 years old and could make his own choices, guardians were concerned about ward's safety and his ability to make sound choices due to his mental health issues:

- "Our biggest concern is [ward's] safety. [Ward] hasn't been making safe choices. He doesn't have a stable living space. * * * But at the same time, you know, he has a lot of mental health issues that are going on.

- "[H]e's 18. Whether the guardianship's there or not he's going to do whatever he's going to do, but I—I am concerned about, you know, the choices that, you know, his finances, what he's—[where] he's going, you know, he's making choices to do illegal things to get money and to—he's bouncing from home to home. Part of it is because he's caught stealing or there's an altercation that's happened and there's no stability. And so when his Social Security Disability finally gets approved, hopefully over the summer, he's going to come in to all this money and he has no—his skill level and his common sense level doesn't give him the tools that he needs to not just pilfer all that money away or give it all away or use it on illegal items. And that's going to leave him in the place that he is now with no money and no place to live.

- "And, you know, I think that he's proven that he needs some sort of setting where he can have some sort of guidance on a regular basis to help him make better choices, to make sure he's getting his counseling and taking his medications * * *."

After the juvenile court noted that one of the original bases for jurisdiction over ward was his educational, medical, and counseling needs, ward testified about his homelessness, disabilities, and plans for financial self-sufficiency. Ward stated that he was 19 years old and that when he was age 17 and 18, he "had a record of running away from his problems." Ward admitted that he had moved out of his guardians' home after turning 18 and that he had sometimes lived on the streets and utilized a transitional living program. Ward testified that he had lived with his mother for three months and that, after moving out of his mother's home, he had stayed with MC for a couple of months. Ward moved out when he noticed MC was "starting to get verbally aggressive" and then "noticed the signs of him becoming the—basically the same person." Ward testified that he did not feel like he was in any kind of danger during the time he stayed with his mother. Regarding his

current and future living arrangements, ward explained that he was staying at the transitional living program and that he planned on living with a friend, who had his own "apartment, * * * food, water, shower, bed, everything." When asked about his disabilities, ward replied, "I am high functioning autistic. Basically Asperger [s]yndrome." Ward also stated that he was diagnosed with "bipolar II" disorder when he was 17 or 18 years old. In addition, he mentioned that he also suffers from an eye condition, nystagmus, that makes it harder for him to see people. As for income, ward stated that he planned to attend a state-promoted job corps orientation and that he had an attorney and an upcoming hearing to obtain Social Security disability benefits. He also testified that he had graduated from high school with a modified diploma.

On cross-examination by guardian, and over his counsel's objections, ward admitted that he had engaged in illegal conduct and was not financially self-sufficient. Ward admitted to trying methamphetamine, smoking marijuana, and shoplifting. He also admitted that he had lost government food assistance benefits and no longer had the health insurance that his guardians had previously provided.

In closing argument, ward's counsel argued that the jurisdictional bases no longer existed, as demonstrated by the testimony. Counsel argued that, although ward had made some poor choices, he was 19 years old and no longer in danger of being subjected to physical abuse by his mother or MC. In addition, counsel argued that ward was self-sufficient. Counsel acknowledged guardians' safety concerns but argued that they did not involve the bases for jurisdiction and, therefore, the court should dismiss jurisdiction.

At the conclusion of the hearing, the juvenile court decided that guardians had met their burden to prove the continued existence of some of the six original jurisdictional bases. The court concluded that three out of the six jurisdictional bases had not been ameliorated: the first and third (mother's failure to protect ward from abuse by MC) and the fifth (ward's special educational, medical, and counseling needs).

Relying on ward's testimony that he had lived with his mother for three months and then with MC for a couple of months, the court found that ward "needs additional protections from associates such as his mother, * * * who doesn't protect him. Also from [MC], * * * who he has no protection from." The court disagreed with ward that his decision to move out from MC's home indicated that he was "perfectly capable of taking care of himself." The court noted,

> "[c]learly he's not perfectly capable of taking care of himself. He's living on the streets, doing drugs, committing crimes, stealing, otherwise homeless. That's not perfectly capable of taking care of yourself when you lose your ability to collect food stamps and testify that you're not sure how you're going to feed yourself * * *."

And, relying on the evidence initially presented by guardians (the annual report, letter, and initial testimony of ward's guardian), the court found "a basis for an ongoing need to address the special educational, medical and counseling needs of [ward]." The court considered that, if the guardianship were to continue, guardians could help ward to obtain appropriate medications and mental health treatment. The court determined that it was in ward's best interest to continue the guardianship and denied ward's motion to dismiss jurisdiction, terminate wardship, and vacate the guardianship.

## II.  DISCUSSION

On appeal, ward raises three assignments of error based on the denial of his motion (1) to dismiss jurisdiction, (2) to terminate the wardship; and (3) to vacate the guardianship. Because it is dispositive, we begin with ward's first assignment of error, in which he contends that the juvenile court should have dismissed jurisdiction because the guardians had not proved a continuing basis for jurisdiction.

### A.  *Statutory Framework*

We begin with an overview of the relevant statutes governing the juvenile court's exercise of jurisdiction over ward and the legal custody and guardianship of a ward under ORS chapter 419B.

A juvenile court may exercise original jurisdiction over a child who is under 18 years of age and "[w]hose condition or circumstances are such as to endanger" the child's welfare. ORS 419B.100(1)(c). When a juvenile court exercises jurisdiction, the child becomes a ward of the court. ORS 419B.328(1). The wardship continues, and the ward is subject to the court's jurisdiction, until one of a number of events occurs. Those include the court's dismissal of the petition concerning the ward, the court's entry of an order terminating the wardship, or the ward becoming 21 years of age. ORS 419B.328(2)(a), (c), (e). However, a wardship cannot continue if the factual bases for jurisdiction have ceased to exist. *J. M.*, 260 Or App at 267; *Dept. of Human Services v. D. M.*, 248 Or App 683, 685, 275 P3d 971 (2012).

The court also determines custody of the ward. It may direct that the ward remain in the legal custody of the ward's parents or direct that the ward be placed in the legal custody of, among others, a relative. ORS 419B.331. Or, when the court determines that it would be in the best interest and for the welfare of the ward, the court may place the ward in DHS's legal custody under ORS 419B.337(1). The court may dismiss commitment of a ward to DHS's legal custody later if, among other reasons, the court determines that a safe alternative to reunification with the ward's parents has been implemented for the ward. ORS 419B.337(7)(a)(A). In this case, the juvenile court initially placed ward in DHS's legal custody and later dismissed commitment of ward to DHS, giving legal custody of ward to guardians instead.

In addition, ORS chapter 419B provides that, when the wardship is established, either the juvenile court or its designee will serve as the ward's legal guardian. *Former* ORS 419B.370(3) (2003) provides that, when a child becomes a ward of the court, "the court as an incident of its wardship has the duties and authority of the guardian as provided in ORS 419B.376[.]" Thus, *former* ORS 419B.370 (2003) and ORS 419B.376 make the juvenile court, as an incident of its wardship, the ward's guardian. And, the juvenile court may transfer that authority to the ward's legal custodian. *Former* ORS 419B.370(1) (2003) provides that, if the juvenile court

grants legal custody of a ward to DHS, "it may also grant guardianship of the ward to the department, to remain in effect solely while the ward remains in the legal custody of [DHS]." Alternatively, if to do so would be in the interests of the ward, the court may grant guardianship of the ward to a suitable person who has custody of the ward. *Former* ORS 419B.370(2) (2003).

As a general matter, a guardianship that arises as an incident of wardship will not be long term. *Dept. of Human Services v. S. M.*, 355 Or 241, 247, 323 P3d 947 (2014). Rather, under ORS chapter 419B, at least two long-term legal guardianships may be appropriate for a ward. *S. M.*, 355 Or at 247. First, the juvenile court may establish a permanent guardianship if it finds by clear and convincing evidence that a ground for terminating parental rights exists, that it is in the ward's best interest that the ward's parents should never have physical custody of the ward, but that other parental rights and duties should not be terminated. ORS 419B.365(3). Second, the court may establish what is sometimes referred to as a "durable guardianship,"[4] if the court finds by a preponderance of the evidence that the ward cannot safely be returned home within a reasonable time, that adoption is not an appropriate plan for the ward, that the proposed guardian is suitable, and that a durable guardianship is in the ward's best interests. ORS 419B.366(2), (5).

But a durable guardianship was not an available option for ward in 2003. Although the legislature had authorized such guardianships, the provision was not effective until January 1, 2004—months after ward's permanency hearing. *See* Or Laws 2003, ch 229, § 2. Instead, the available alternative was a guardianship arising as an incident of wardship. The legislature had provided for such guardianships in 1993. *See* Or Laws 1993, ch 33, § 114 (enacting

---

[4] The term "durable guardianship" is not used in ORS 419B.366, but we use that term to distinguish a guardianship established under that statute from a permanent guardianship established under ORS 419B.365 and from a guardianship as an incident of wardship (also known as a guardianship as incident of custody) established under *former* ORS 419B.370 (2003). *Dept. of Human Services v. K. H.*, 256 Or App 242, 244 n 1, 301 P3d 427, *adh'd to as modified on recons*, 258 Or App 532, 310 P3d 671 (2013), *rev den*, 354 Or 699 (2014).

what is now codified as ORS 419B.372); *S. M.*, 355 Or at 250-51. In this case, *former* ORS 419B.370 (2003) allowed the juvenile court to establish a long-term guardianship for ward that was similar to a durable guardianship by placing ward in the legal custody of his aunt and uncle and appointing them as legal guardians.

## B. *Motion to Dismiss Jurisdiction*

With that background in mind, we turn to the issue that divides the parties: whether guardians met their burden of proving that the factual bases for jurisdiction persisted. Ward argues that guardians failed to meet their burden because the evidence did not support a finding that the original jurisdictional facts "persist[ed] to the degree that they pose[d] a current threat of serious loss or injury that was reasonably likely to be realized," *J. M.*, 260 Or App at 267, and that a finding based on best interests was insufficient to maintain jurisdiction over a 19-year-old adult. We agree with ward that the record was legally insufficient to support the court's denial of ward's motion to dismiss jurisdiction.

In response to ward's motion, guardians had to show, by a preponderance of the evidence, that the factual bases for jurisdiction persisted to the degree that they posed a *current*—not speculative—threat of serious loss or injury that was reasonably likely to be realized. *Id.*; *see also State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010) (stating that proponents must prove "that there is a *current* risk of harm and not simply that the child's welfare was endangered at some point in the past" (emphasis in original)). The "key inquiry in determining whether condition[s] or circumstances warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child," *C. Z.*, 236 Or App at 440 (internal quotation marks omitted), and "[the proponent of jurisdiction] has the burden to demonstrate a nexus between the allegedly risk-causing conduct and the harm to the child," *see Dept. of Human Services v. A. B.*, 264 Or App 410, 416, 333 P3d 335 (2014). We noted in *D. M.* that a motion to dismiss wardship that is considered at a review hearing does not require a "retrial of the original allegations" and instead focuses on "whether the conditions that

were originally found to endanger a child persist." 248 Or App at 685 (quoting *State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 372, 774 P2d 484, *rev den*, 308 Or 315 (1989)).

It was apparent to the juvenile court that ward's circumstances—his disabilities and poverty—were less than ideal and that it would be in his best interest if the court retained jurisdiction and did not disturb the guardianship. However, the dispositive question is whether the factual bases for jurisdiction persist to the degree that they pose a current threat of serious loss or injury that is reasonably likely to be realized. On that point, we conclude that guardians' evidence was insufficient as a matter of law.

Regarding the jurisdictional bases involving mother's failure to protect ward from abuse by MC, the court found that those bases had not been ameliorated and that ward needs protection from both mother and MC. The primary facts on which the juvenile court relied for its finding were that ward lived with mother for three months and that they did not get along and that ward lived with MC for a couple of months. The court highlighted that MC had physically abused ward as a child and that, according to ward's testimony, MC "got into [ward's] face causing [ward] to move out."

Thus, the record included some evidence that MC posed some level of risk to ward while ward was living with MC; however, evidence that ward's welfare might have been endangered at some point in the past is insufficient to prove jurisdiction. At the time of the hearing, there was no evidence of a *current* threat of serious loss or injury that was reasonably likely to be realized. There was no evidence in the record that mother or MC physically abused ward during the months that he lived with each of them or that it was reasonably likely that ward would suffer any harm from MC in the future. At the time of the hearing, ward was not living with MC and had other plans for housing. Thus, the evidence does not support the court's finding that ward needed further protection from MC or mother.

Unlike the other jurisdictional bases focused directly on harmful behavior by adults in ward's life when he was younger, the fifth jurisdictional basis involved ward's own

special educational, medical, and counseling needs that, considering the totality of the circumstances, were such as to endanger his welfare. *See* ORS 419B.100(1)(c) (a juvenile court has original jurisdiction "in any case involving a person who is under 18 years of age" and whose "condition or circumstances are such as to endanger the welfare of the person or of others"). The juvenile court found that there was an ongoing need to address ward's special needs, even though he is now an adult and no longer living with mother or guardians. The juvenile court noted that ward had mental health issues at the time of the hearing, and ward himself admitted that he is autistic and had been diagnosed as bipolar when he was 17 or 18 years old. In addition, the court found that ward is "living on the streets, doing drugs, committing crimes, stealing, otherwise homeless." Thus, the juvenile court implicitly found that ward's current disabilities endangered ward or would likely endanger ward in the future.

However, the record does not reflect how ward's special needs as a young child in mother's care, part of the conditions or circumstances that endangered ward and gave rise to dependency jurisdiction, also persisted into 2015. As noted earlier, the record contains no information regarding when ward was diagnosed with autism and what special needs ward had when the court took jurisdiction in 2001, when ward was six years old, or even as they developed over the course of the court's jurisdiction over ward. The only information about the timing of the existence or recognition of the disabilities that ward described at the hearing relates to his bipolar diagnosis, which occurred when he was 17 or 18 years old and in high school. And, again, at the time of these proceedings, ward was no longer dependant on mother or living with guardians. Accordingly, we conclude that the juvenile court's finding that the fifth factual basis for jurisdiction persisted is not supported by the evidence.

In sum, we conclude that the facts and inferences that guardians are entitled to rely on did not satisfy their burden of establishing that, at the time of the hearing, the jurisdictional bases persisted and posed a current threat of serious loss or injury to ward that was reasonably likely to be realized. Accordingly, the juvenile court erred in denying ward's motion to dismiss jurisdiction.

C. *Motion to Terminate the Wardship and Motion to Vacate the Guardianship*

We turn next to ward's second and third assignments of error, in which he argues that the juvenile court erred by denying his motions to terminate the wardship and to vacate the guardianship. Given our conclusion that the juvenile court erred by denying the ward's motion to dismiss jurisdiction, we need not address the specifics of those assignments of error. That is so because the wardship ends when the juvenile court dismisses the petition for jurisdiction, *see* ORS 419B.328(2)(a),[5] and a guardianship as an incident of custody dissipates when neither the guardians nor DHS has legal custody of the ward, *see* ORS 419B.372.[6]

Reversed and remanded with instructions to terminate the wardship and vacate the guardianship.

---

[5] Under ORS 419B.328(2)(a), "[t]he court's wardship continues, and the ward is subject to the court's jurisdiction, until *** [t]he court dismisses the petition concerning the ward[.]"

[6] Under ORS 419B.372(1), "[w]hen the court grants legal custody to [DHS], it may also grant guardianship of the ward to the department, *to remain in effect solely while the ward remains in the legal custody of the department.*" (Emphasis added.) That provision should apply equally to a "suitable person" under ORS 419B.372(2).