Submitted October 10, reversed and remanded December 18, 2019

In the Matter of N. A. G.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. D. G.,
aka T. D. G.,
*Appellant.*

Lane County Circuit Court
17JU08577; A170989

455 P3d 591

In this juvenile dependency case, father appeals the juvenile court's denial of his motion to dismiss jurisdiction. The juvenile court asserted jurisdiction over father's son, N, in October 2017, based on threats of harm to N from father's physical abuse of N's older brother J, father's use of physical discipline, and father's driving behavior. In March 2019, father moved to dismiss jurisdiction as to N, arguing that there was no evidence that the conditions that initially endangered N persisted. The juvenile court denied the motion. Father appeals. *Held*: The trial court erred in denying father's motion. The state did not meet its burden to prove that the factual bases for jurisdiction continue to pose a current threat of serious loss or injury to N that is reasonably likely to be realized.

Reversed and remanded.

Ilisa Rooke-Ley, Judge.

G. Aron Perez-Selsky filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and E. Nani Apo, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

AOYAGI, J.

Reversed and remanded.

**AOYAGI, J.**

In this juvenile dependency case, the juvenile court asserted jurisdiction over father's son, N, in October 2017, based on threats of harm to N from father's physical abuse of N's older brother, father's use of physical discipline, and father's driving behavior.[1] In March 2019, father moved to dismiss jurisdiction, arguing that there was no evidence that the conditions that initially endangered N persisted. The juvenile court denied the motion. Father appeals. Because we agree with father that the state did not meet its burden to prove that the factual bases for jurisdiction continue to pose a current threat of serious loss or injury to N that is reasonably likely to be realized, we conclude that the trial court erred in denying father's motion and, accordingly, reverse.

## FACTS

"[W]e view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to permit [the] particular outcome." *Dept. of Human Services v. J. M.*, 275 Or App 429, 431, 364 P3d 705 (2015), *rev den*, 358 Or 833 (2016) (internal quotation marks omitted). We state the facts in accordance with that standard.

N lived with father, mother, and older brother J until he was two years old. When N was two, father was incarcerated. For several years thereafter, N alternated between living with his maternal grandparents and living with mother. Since age five, N has lived with his maternal grandparents.

When N was seven years old, father was released from prison and moved to Eugene. Six months later, J, who is two years older than N, moved in with father. N continued to live with his maternal grandparents in nearby Springfield. From ages seven to 10, N visited father on a regular basis.

---

[1] The juvenile court also asserted jurisdiction over N on several bases regarding mother, but mother is not a party on appeal, so we do not discuss those bases.

When N was 10, father finished college and got a job in Bend. He and J moved to Bend. Father had planned for N to move to Bend too, but N was seeing a therapist (for attention deficit hyperactivity disorder and trauma), and both the therapist and N's grandparents suggested that father wait to move N. N therefore continued living with his grandparents in Springfield. After father's move, N's visits with his father were less frequent. Father and J eventually moved from Bend to Redmond.

In October 2017, when N was 12 years old, DHS became involved with the family after N told his therapist about two incidents. First, N told his therapist that father had smoked marijuana and driven erratically with N in the car. Second, N told his therapist that, during a road trip in July or August 2017, father had thrown J up against a car, put his hand around J's throat, and "lift[ed] him up." Upon learning what N told his therapist, DHS removed J from father's home.

The juvenile court subsequently asserted jurisdiction over both J and N. As to N, the court held a jurisdictional hearing in January 2018. It determined that it had jurisdiction over N on three bases regarding father: (1) "father physically abused his older son, and represents a threat of harm to the child"; (2) "father's use of physical discipline represents a reckless disregard to injury and represents a threat of harm to the child"; and (3) "father's driving behavior while under the influence of marijuana frightens the child, and represents a threat of harm." N continued to live with his maternal grandparents as his DHS placement.

In connection with asserting jurisdiction, the court ordered father to engage in certain services: (1) "[p]articipate in and successfully complete a DHS/CWP approved parent training program, sign releases of information, and demonstrate skills learned in the program"; (2) "[m]aintain safe and stable housing as approved by DHS/CWP"; (3) "[p]articipate in and successfully complete a comprehensive psychological evaluation with a DHS/CWP approved provider, sign releases of information, and follow services recommended from the evaluation"; (4) "[p]articipate in and successfully complete a substance abuse evaluation with a DHS/CWP

approved provider, sign releases of information, follow any and all recommendations for treatment and demonstrate a drug-free lifestyle"; and (5) "[p]articipate in therapeutic services with the child as recommended by the child's therapist." DHS gave father a letter of expectation outlining the services ordered by the court and a timeline for working toward the return of N and J.

Father engaged in services of the type ordered, but he did not comply with aspects of the court's order, particularly as related to DHS approvals and information releases. Father completed two parenting programs focused on teenagers that had been recommended by the Deschutes County DHS office; father testified that those programs were useful but generalized for a group setting, and the court described his attitude toward them as "unenthusiastic." Father participated in a substance abuse evaluation, which indicated that there was no need for substance abuse services. Father engaged in individual counseling. And father participated in a psychological evaluation. The psychological evaluator issued a report stating that she saw "no indication that [father] is an angry, impulsive, or controlling individual" and that, although father could benefit from continued individual counseling, she did not recommend any services for father.

According to DHS, none of the foregoing services were approved by DHS, nor did father sign information releases for DHS. In general, father has been "open" (in the DHS caseworker's words) about his negative feelings toward DHS and has indicated his belief that DHS should not be involved in his family and has "kidnapped" his child.[2]

In July 2018, after father had engaged in the above-described services, J returned home to father. Father worked with a DHS-recommended family builder to develop a transition plan for J. Father had a good relationship with

---

[2] It appears that father's negative feelings toward DHS take the form of both noncooperation (as discussed above) and at least occasional outright hostility. For example, after the hearing at which the juvenile court asserted jurisdiction over J and N, father told the DHS caseworker to "f-off," called a Child Protective Services worker "the c-word," and "flipped off" the caseworker and the CPS worker as he left. According to father, his reluctance to work with DHS is because he is scared of DHS.

the family builder, despite the connection to DHS. The family builder's report contained positive statements about father but also indicated that father, while understanding the safety concerns identified by DHS, minimized their effect on his children and had unpredictable responses to feedback or suggestions. In any event, J returned home and has lived with father since July 2018. According to J, since returning home, father's discipline usually consists of father sending J to his room and then talking to J about what he did wrong, and there is "[a] lot less voice-raising" than there was before the DHS removal. The juvenile court terminated its jurisdiction over J in November 2018.

N has not seen father much since the juvenile court took jurisdiction of him. Between October 2017 and January 2019, N and father had five visits. The last visit was in January 2019, when father, J, and N took a ski trip. N describes that trip as "fun." Nothing about father's demeanor on that trip worried N. N does not recall whether father ever raised his voice during the ski trip.

After the ski trip, in February 2019, a DHS caseworker told father that DHS would not allow N to visit father until DHS saw father's home. Father was unwilling to tell DHS his and J's address. Father sent a text to N: "Sounds like we won't see each other until you're 18. I'm not working with that piece-of-shit liar [a specific DHS caseworker] or your lousy grandparents. They can all fuck off. So good luck, dude, I'll see you in five years. Love you." N remembers receiving that text but "really do[es]n't know" how it made him feel. Father testified that he realizes that the text "probably hurt [N's] feelings."

In March 2019, when N was 14 years old, father moved to dismiss jurisdiction over N. The juvenile court held a hearing on the motion in April.[3] DHS called the DHS caseworker, N, N's therapist, and N's grandmother to testify. Father called himself, his girlfriend, J, and the DHS caseworker.

---

[3] Father made his motion to dismiss in conjunction with a permanency hearing. Only the ruling on the motion to dismiss is before us on appeal, so we limit our discussion to the motion to dismiss.

As relevant here, N testified that he wants to see father once or twice a month but to continue living with his grandparents. He feels like his grandparents are his parents, and their home is "basically the only home [he's] known." N does not want to move from Springfield to Redmond to live with father, because he would have to "move counties," "wouldn't have any friends there," and "wouldn't really know anyone." Also, N "like[s] living with [his] grandparents." He "do[es]n't really have, like, a relationship with [his] dad." N's primary concern about living with his father is that "I don't really know him at all. We don't really hang out a lot." As noted, the last time N saw father was on the ski trip in January, which was "fun." Asked if he recalled whether father had ever raised his voice during that trip, N could not recall him doing so. Asked if it scares him when father raises his voice, N said that it does "[a] little bit."

N's therapist testified that N had "reported to [her] several times that he's afraid to live with his dad; he doesn't want to live with his dad." She did not indicate when N made those statements. N's therapist would not recommend joint therapeutic sessions with N and father at this time—"[a]nd the only reason is because [father] still has yet to take any accountability for the things that have happened." Asked whether she had concerns about N moving in with father without such therapeutic services, the therapist said that she did: "My concerns are I fear, that given the number of threats that [N] has reported to me that his father has made, that eventually his dad is going to end up hitting him. That's my fear." The therapist was not asked and did not specify the nature of the referenced threats or when they had been made or reported. When asked how she thought it would affect N if he were removed abruptly from his grandparents' home, the therapist said, "It would be extremely traumatic. In my opinion it would traumatize him greatly."

The DHS caseworker testified that N is developing normally and has no special needs. N missed seven days of school in the first quarter of the 2018-2019 school year, had a D or F in four classes, and was suspended from school twice in 2018 (once for making a "gun hand" gesture and once for physically fighting a student with autism). With regard to

the services that father has participated in, father did not obtain approval from DHS for those services. Father also did not sign information releases, which prevented DHS from providing background information to the instructors and evaluators and communicating with them to ensure they heard more than one "side of the story" and understood what DHS hoped to address. Father did provide the psychologist with copies of the children's petitions for jurisdiction, shelter order, protective custody reports, screening reports, and assessment summaries—and DHS would have provided those same documents to a DHS-approved psychologist. The caseworker did not criticize any of the services that father received or the service providers, but he believed that they would have been more effective if DHS had approved them and had been able to communicate with the providers.

J testified that he is happy living with father. Whereas his grandparents "never asked about homework" and made it easy to get away with skipping school, father helps him with homework, makes sure he goes to school on time every day, and supports after-school activities. J understands that N does not want to live with father the way that J did, but he also thinks that grandparents' home is not "a great place for [N]," because N does not get help with homework, does not go outside, and "his fun is sitting in his room and playing [video games] by himself." As for father's discipline methods, J testified that father does not use physical discipline, that father is not aggressive, and that he is not afraid of father. Father uses nonphysical discipline and, even as to that, there is "[a] lot less voice-raising" since he returned home than there was before the DHS removal.

Father's testimony about his current discipline methods was consistent with J's testimony. Father stated that he endeavors to be more consistent, stops "talk-back" right away instead of letting it happen a few times before addressing it, and imposes consequences for misbehavior. When J requires discipline, father sends J to his room and then has a conversation with him about what he did wrong. Father also takes away privileges from J and assigns chores to J (for which he pays J) as discipline. J's grades and school attendance have improved dramatically since J moved

in with father. Father expressed frustration with how N's grandparents have handled N's poor academic performance and misbehavior at school. Father stated that he has high standards for his children. He believes that there should be consequences for poor behavior, whereas, in his view, N's grandparents "coddle" N and, when he misbehaves, just tell him to "[g]o to [his] room and play video games."

Father further testified that he understands that N prefers living with his grandparents. However, father "believe[s] that [his] parenting and [his] moral values have a heavier weight [than N's] choice of what he wants." In father's view, N "doesn't know what's best for him." J also "didn't want to leave his friends" and "didn't want to do all this stuff," but, now, "[J] realizes that [moving] was a better choice for him." Father concluded, "What I want for [N] I know he's going to turn out to be a better person than on the road he's going right now." If N moves to Redmond, father intends to have a "long transition plan," which includes having N spending every other weekend with his maternal grandparents so that he can maintain that relationship.

The juvenile court took the matter under advisement at the conclusion of the hearing and, ultimately, denied father's motion to dismiss jurisdiction. Father appeals.

## ANALYSIS

Under ORS 419B.100(1)(c), the juvenile court has jurisdiction over a child "[w]hose condition or circumstances are such as to endanger the welfare" of the child. The question is whether, "under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 633, 310 P3d 1186 (2013), *rev dismissed*, 2014 WL 5462426 (2014). "[I]n order for a juvenile court to take jurisdiction over a child on the ground that the child is endangered, the state must establish both that the child is at risk of a certain severity of harm and that there is a reasonable likelihood that the risk will be realized." *Dept. of Human Services v. S. D. I.*, 259 Or App 116, 121, 312 P3d 608 (2013). "To do so, the state must present evidence about both the severity of the harm and the likelihood that it will occur." *Id.*

Once the court has taken jurisdiction, "[f]or the court to maintain jurisdiction, the jurisdictional bases—*i.e.*, the conditions or circumstances—must continue to pose a current threat of serious loss or injury, and there must be a reasonable likelihood that the threat will be realized." *A. R. S.*, 258 Or App at 633-34. That is, "the conditions or circumstances must present a threat of danger—*i.e.*, serious loss or injury—that is *current* and *not speculative.*" *Id.* at 634 (emphasis added). "A wardship cannot continue if the jurisdictional facts on which it was based have ceased to exist." *Dept. of Human Services v. J. M.*, 260 Or App 261, 267, 317 P3d 402 (2013).

Importantly, if a parent moves to dismiss jurisdiction while a child's permanency plan is reunification, the burden of proof is on DHS, not the parent, to show that the conditions or circumstances giving rise to jurisdiction still exist. *Dept. of Human Services v. T. L.*, 279 Or App 673, 687, 279 P3d 741 (2016); *see also J. M.*, 260 Or App at 267 ("DHS has the burden of showing that the conditions that were originally found to endanger the child persist."). Specifically, "DHS must show, by a preponderance of the evidence, that the factual bases for jurisdiction persist to the degree that they pose a current threat of serious loss or injury that is reasonably likely to be realized." *J. M.*, 260 Or App at 267.

In this case, there were three jurisdictional bases at issue when father moved to dismiss jurisdiction: father's physical abuse of J, father's use of physical discipline, and father's driving behavior. We begin with the last basis. In opposing father's motion to dismiss, DHS presented no evidence regarding father's current driving behavior or marijuana use, and, in denying father's motion to dismiss, the court did not mention or make any findings regarding father's current driving behavior or marijuana use. On appeal, the state makes no substantive mention of that jurisdictional basis. Therefore, it is undisputed that DHS failed to prove any continued risk of harm to N from father's driving behavior related to marijuana.

We next turn to the court's findings and conclusions regarding physical abuse of J and use of physical discipline.

In denying father's motion, the court found "that the conditions that initially endangered the child persist and pose a threat of harm; particularly the Father's *use of physical discipline* and his disregard for how that represents a threat of harm to the child." (Emphasis added.) The court further noted that father "continued to deny" having choked J in 2017 and "refuses to acknowledge any deleterious effect" on N.

The difficulty with the court's ruling as it pertains to physical discipline is that it depends on father's ongoing "use of physical discipline," but there is no evidence that father has continued to use physical discipline or is likely to do so in the future. Although father disputed having used *inappropriate* physical discipline prior to DHS's removal of J, father agreed with the family builder not to use *any* physical discipline when J returned. The only evidence is that he has complied with that condition. On this record, the last— if not only—incident of physical abuse or physical discipline against J occurred in July or August 2017. At the time of the hearing, J had been back home and living with father for approximately eight months—including five months with no DHS involvement—during which there was no evidence of a single incident of father physically disciplining or physically abusing J. To the contrary, father, father's girlfriend (who lives with father and J), and J all testified that father has only used nonphysical discipline since J returned home. That is particularly significant since there is no evidence that father has ever used physical discipline against *N* or physically abused *N*.

As for father's refusal to admit to choking J, that is something that N's therapist, DHS, and the juvenile court all focused on. On appeal, DHS argues that father's refusal to admit to choking J (as the juvenile court found that he did when taking jurisdiction) has "prevented [father] from learning and implementing ways in which he could prevent that kind of escalation with [N] in the future." While it is no doubt beneficial for parents in juvenile dependency actions to take full responsibility for their past actions, a parent's unwillingness to admit to every fact found by the juvenile court, or failure to take full responsibility for past actions,

does not in and of itself give the court jurisdiction over a child. Rather, as we have said before, "[e]vidence that a parent has not fully acknowledged the extent or consequences of his or her past endangering conduct can be a basis for continued jurisdiction only if there is evidence that the parent's failure to do so *makes it likely that the parent will engage in the conduct again.*" *Dept. of Human Services v. L. C.*, 267 Or App 731, 743, 343 P3d 645 (2014) (emphasis added).

In this case, there is no evidence that would allow a determination that, "under the totality of the circumstances, there is a reasonable likelihood" that father will physically abuse J again or use physical discipline again unless he admits to choking J in July or August 2017. *A. R. S.*, 258 Or App at 633. At the time of the hearing, J had been living with father for eight months, and the only evidence was that father has changed his disciplinary methods since receiving services and now relies exclusively on nonphysical discipline in disciplining J. The DHS caseworker testified that he had "no safety concerns" about J living with father. Indeed, even as to nonphysical discipline, J reports "[a] lot less voice-raising" since he returned home.[4]

In concluding that continued jurisdiction was warranted, the court emphasized differences between J and N, particularly their "different ages," "different placement preferences," and "different dispositions." J was willing to return home to father, while N did not want to. N is "a sensitive child [who] tends to be more open and affectionate than his brother, [J]," and N had a "severe stress reaction" for two weeks after testifying at the original jurisdictional hearing. It would be "extremely traumatic" for N to return to father, the court continued, citing N's therapist's testimony.

The issue before the court, however, was not whether N preferred to live with his grandparents or his father, or even which home would be "better" for him. The

---

[4] To the extent that DHS argues on appeal that father's new *nonphysical* discipline methods may be less effective with N than they have been with J, because N is more "sensitive" than J, and could result in "serious emotional, behavioral, and possibly physical consequences for [N]," that argument tends toward the speculative on this record. In any event, the argument is inconsistent with the bases of jurisdiction, which pertain to *physical abuse* of J and the use of *physical discipline.*

only issue was whether the conditions or circumstances that gave rise to jurisdiction continued to pose a risk of serious loss or injury to N that was reasonably likely to be realized. The conditions or circumstances at issue in this case are *father's physical abuse of J* and *father's use of physical discipline*. The fact that N is two years younger than J, prefers to continue living with his grandparents, and is more sensitive than J has little or nothing to do with the likelihood that, if N moves in with father, father will physically abuse J or use physical discipline against J or N.[5]

Lastly, in denying father's motion, the juvenile court referenced father's hostility toward DHS, his blaming of N's grandparents, his failure to obtain DHS approval for services he received, and his failure to sign releases of information to DHS. Hostility towards DHS is not itself a basis to continue jurisdiction. *Cf. State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 83-84, 106 P3d 627 (2005) (in a parental-rights-termination case, the existence of hostility towards DHS "did not, without more, constitute evidence of a condition seriously detrimental to *the child*" (emphasis in original)). Nor does failure to fully comply with the court's order as to services, in and of itself, allow the court to continue jurisdiction. Rather, again, it was DHS's burden to prove that the circumstances or conditions that gave rise to jurisdiction continue to pose a serious risk of injury or loss to N that is reasonably likely to be realized. If they do *not*, the fact that father failed to fully comply with the court's order, was uncooperative with DHS, and expressed dissatisfaction with some aspects of grandparents' parenting does not permit continued jurisdiction.

As we said in *J. M.*, "[w]hen a parent has participated in some services, yet there is concern that the parent has not internalized better parenting techniques, the

_____

[5] We note that, in this case, the juvenile court has never asserted jurisdiction over N on the basis that father lacks a relationship with N and needs DHS's assistance to establish such a relationship. Although N has not lived with father for many years, that was not one of the original grounds of jurisdiction over N, nor did DHS seek to amend the petition to add allegations regarding father's relationship with N (or lack thereof). As such, the court was limited to considering the existing jurisdictional bases. *Dept. of Human Services v. C. L. M.*, 300 Or App 603, 605, 454 P3d 28 (2019).

dispositive question is not what a parent believes, but what that parent is likely to *do*. In such circumstances, legally sufficient evidence links the lack of insight to the risk of harm." *J. M.*, 275 Or App at 441 (emphasis in original; internal quotation marks, brackets, ellipses, and citations omitted). Here, although father may still dispute what exactly he did to J in July or August 2017, the only evidence is that father agreed with the family builder to stop using any physical discipline, has in fact stopped using physical discipline, and has only used nonphysical discipline in the eight months since J returned home. The DHS caseworker himself testified that he had "no safety concerns" for J, and the court noted at the hearing that it "underst[oo]d that [father] is parenting [J] now and it's going great."

The court's determination that N nonetheless continued to be at current risk of serious harm from father's *physical abuse of J* and *use of physical discipline*, and that such harm was reasonably likely to be realized, cannot be squared with the evidentiary record. DHS argues that "a parent's ability to safely care for one child is not determinative of whether other children can safely be returned home." That is certainly true, but, in this case, the first jurisdictional basis pertains to father's physical abuse *of J*, so N's safety is inextricably linked to J's as to that jurisdictional basis—and it appears to be undisputed that J is no longer at risk of physical abuse by father (or at least not a risk that is reasonably likely to be realized). As to father's use of physical discipline, there is no evidence—nor does DHS explain why it would be the case—that father is more likely to physically discipline N, whom he has never previously physically disciplined (based on this record), than J, whom father *has* previously physically disciplined. The undisputed evidence that father no longer physically disciplines J—and had not for at least eight months at the time of the hearing on father's motion—is therefore directly relevant to the risk to N in this particular case and in these particular circumstances.

Although it is possible that father could physically abuse J again, or that he could resume the use of physical discipline in the future, the record in this case was insufficient for the court to determine that father' physical abuse of J and use of physical discipline continue to pose a current

threat of serious loss or injury to N that is reasonably likely to be realized. Accordingly, we reverse the trial court's denial of father's motion to dismiss jurisdiction.

Reversed and remanded.