Argued and submitted August 26, affirmed December 9, 2015, petitions for review denied March 24, 2016 (358 Or 833)

In the Matter of C. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. M.
and A. M. W.,
*Appellants.*

Washington County Circuit Court
J120144;
Petition Number 01J120144;
A157618

364 P3d 705

Christa Obold Eshleman argued the cause and filed the briefs for appellant J. M.

Megan L. Jacquot argued the cause and filed the brief for appellant A. M. W.

Erin K. Galli, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Hadlock, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

In this juvenile dependency case, father and mother appeal a corrected permanency judgment that changed the permanency plan for parents' child, C, from reunification to adoption. Before the hearing to change the plan, parents moved to dismiss jurisdiction and terminate the wardship. At the hearing, the juvenile court denied parents' motion to dismiss and changed the plan to adoption based on factual findings related to two jurisdictional allegations: first, that C sustained an unexplained physical injury—a fracture to her tibia—while in parents' care and, second, that parents' lack of parenting skills made them unable to provide minimally adequate care for C. Parents assign error to both the court's denial of their motion to dismiss and the court's decision to change the plan, arguing that the evidence is not legally sufficient. The Department of Human Services (DHS) responds that the evidence is legally sufficient. We agree with DHS. Accordingly, we affirm.[1]

Parents request *de novo* review. We exercise our discretion to review *de novo* sparingly and only in exceptional cases. *State v. S. N. R.*, 260 Or App 728, 733, 320 P3d 569 (2014); ORAP 5.40(8)(c). This is not an exceptional case, and we decline to exercise *de novo* review. Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient" to permit a particular outcome. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013).

## I. BACKGROUND

This appeal results from the second permanency hearing in this case. We reversed the judgment resulting from the first permanency hearing because the court failed

---

[1] Parents also argue that the court erred by failing to make statutorily required findings before entering its permanency judgment. Although the court subsequently corrected those failures—finding that the omissions were the result of clerical error—and amended its judgment, parents argue that the court also erred in amending the judgment. We reject parents' arguments without discussion and write only to discuss parents' arguments related to their motion to dismiss and the change in plan.

to allow parents to introduce admissible evidence. *Dept. of Human Services v. J. M.*, 262 Or App 133, 325 P3d 35 (2014). In that case, we summarized the facts that gave rise to jurisdiction:

> "This case arose when, at a routine pediatric exam, the pediatrician observed a small bruise on the cheek of then-two-month-old C. Concerned about the potential for abuse, the pediatrician ordered a skeletal survey of C. The x-rays were 'concerning for a probable healing metaphyseal corner fracture in [C's] distal right tibial metaphysis,' that is, a possible fracture of C's tibia. Doctors opined that the fracture was indicative of nonaccidental trauma.

> "Concerned that C had been abused, [DHS] removed C from parents' care and placed her with a foster family. A few months later, parents admitted to facts giving rise to the juvenile court's jurisdiction. Specifically, each parent admitted that his or her 'lack of parenting skills' impaired his or her 'ability to provide minimally adequate care' for C. Each parent also admitted that C 'sustained an unexplained physical injury to include[] distal tibial metaphyseal fracture in the child's tibia while in the care of * * * mother and father.' Based on those admissions, the juvenile court assumed jurisdiction over C in August 2012."

*Id.* at 135-36 (footnote omitted).

Shortly after the court established jurisdiction in August 2012, parents began twice weekly visits with C supervised by DHS. The visits lasted between one and three hours each and were ongoing at the time of the second permanency hearing. Parents missed only one visit between the establishment of jurisdiction and the second permanency hearing, and only one parent was present at two-and-one-half visits.

In September 2012, mother and father each underwent separate psychological and parenting evaluations.[2] Dr. Howard Deitch, the psychologist who examined mother, concluded that mother was "probably not suffering from a mental health or substance abuse disorder." However, her

---

[2] Both psychologists testified about those evaluations at the first permanency hearing, and the court received a transcript of that testimony and the written evaluations into evidence at the second permanency hearing.

evaluations indicated that she minimized or denied problem areas and she likely had a "dependant personality." Consequently, Deitch opined that,

"if [mother's coparent] is dysfunctional and could be a risk to the child, I would have concerns about [mother's] ability to recognize and exercise good judgment for the sake of maintaining that relationship [with the coparent]."

Deitch testified that mother's prognosis for treatment was "not good." Even so, he recommended that she "complete some parenting classes, focus on effectively managing developmental challenges, routine care, [and] disciplinary issues." He testified that mother could mitigate some of the concerns raised by the evaluations by attending those classes and that it was possible that "with knowledge could come even more assertiveness, and with knowledge could come some confidence that, hey, this is the right way to handle it." However, he did not recommend counseling to address mother's dependant personality because, given mother's extreme defensiveness, he was "pretty certain that it would not be a successful treatment outcome."

Ultimately, in light of her defensiveness and dependant personality, coupled with the fact that she had not provided an explanation of C's injury that conformed to the medical evidence, Deitch described his concerns about mother:

"[Y]ou just don't know [how the injury occurred] and so * * * you have to be able to trust * * * that a person is going to make the necessary changes to protect that child. Whether it's not being with the person that most likely abused the child or just showing greater assertiveness in dealing with people and showing more protective type behaviors. In the absence of actually knowing, obviously it's better to know who did it and so they can rectify it."

Dr. Robert Basham, the psychologist who examined father, concluded that father had "problems associated with * * * controlling and managing anger" and that his answers to test questions placed him in a particular, well-studied category of respondents, known as a "4/3 code type." Basham testified that people in that category have good anger control most of the time,

"but [their anger] comes out in outbursts and so maybe it's unpredictable or unexpected. * * * [T]hey're moody individuals, fragile and brittle emotional behavioral controls, temper, outburst, dangerous explosions. Some can be assaultive or combative, particularly associated with alcohol use. But outwardly [they] tend to be pretty much conforming. So many people meeting them might not get the impression that they have a problem controlling their anger."

Consequently, Basham gave father a "rule out diagnosis" of intermittent explosive disorder—meaning that father exhibited some signs of that disorder, yet not enough to give a "firm diagnosis"—and a "provisional diagnosis" of antisocial personality traits—meaning that Basham believed that father probably had those traits.

Father's testing also indicated a high degree of defensiveness and denial, and those indications were consistent with Basham's observations of father during the clinical interview. As an example of father's defensiveness and denial, Basham noted that, although DHS reported that there was a founded case of child abuse against father in 2001 in which father grabbed his seven-year-old daughter by the throat and slapped her, father minimized that history, reporting that either the DHS investigation had not occurred or that the findings were false. In contrast to father's statement during the clinical interview, DHS records indicate that father admitted to the allegations in 2001.

Basham recommended that father receive anger management counseling and attend parenting classes and that DHS gradually increase visits and slowly transition C back to parents' care. However, he recommended that the transition back to parents should not continue if father showed lack of measureable progress in his anger management classes. Father began the first of those 24 recommended anger management classes in December 2012.

Between the psychological examinations, which took place in September 2012, and the first permanency hearing, which took place in July and August 2013, in June 2013, mother's son, who was five years old at the time, began living with mother and father, but parents did not inform

DHS of that arrangement. Despite the other adults in the home, parents were primarily responsible for parenting mother's son.

In August 2013, at the close of the first permanency hearing, the court entered a permanency judgment that changed the plan for C from reunification to adoption. As mentioned, we ultimately reversed that judgment and remanded the case to the juvenile court. *J. M.*, 262 Or App at 139.

After the first permanency hearing, but before we issued our opinion in *J. M.*, DHS became concerned that C might have cognitive and speech delays and recommended her for an evaluation. In September 2013, C was found eligible for services under three evaluative categories: communication, cognitive, and social/emotional. C exhibited significant delays in each category, scoring in the first and lowest percentile in the cognitive category and in the second percentile in the communication category. DHS did not inform parents that C had received testing or that she had qualified for services. However, DHS did inform C's foster parents, who are the prospective adoptive resource in this case.

In December 2013, when C was 18 months old, mother and father began attending parental skills training with their first parental skills trainer, Marlys Petersen. DHS did not inform Petersen of C's developmental delays when she began working with parents.

Petersen's weekly sessions with parents consisted of 15 minutes of training followed by a two-hour visit and a 15-minute debriefing session. Eventually, the visit period was reduced to one-and-one-half hours. During the visits, Petersen spent some time in the room with parents and C and spent other parts of the sessions in an observation room.

At the beginning of her time working with parents and C, Petersen believed that C appeared "emotionally fragile" and was surprised that C's behavior around parents had not changed much over the course of 18 months of parental visits and that C did not show greater attachment to mother.

Throughout the early parental skills training sessions and visits in December 2013, C stayed close to father, avoided eye contact with mother, cried when father left the room, and appeared "really eager to leave." C continued to appear upset throughout the period in which Petersen worked with the family. C would close her eyes or cover her eyes at points during the visits.

In order to get a more objective perspective on C's behaviors during visits with parents, Petersen observed C in foster parents' care. She testified that C's behavior was markedly different with foster parents:

> "[In the foster parents' home] C's just—I don't know. She's just playful and free and chattered and not that she doesn't ever do that in a visit [with parents], but she chattered and she's playing and she engaged and she walks up to me and she walks up to [foster] mom and she—yeah, she just looked very, I don't know, just happy."

However, as mentioned, DHS did not inform parents of C's testing for developmental delays or offer parents services related to those delays. On the other hand, DHS had informed foster parents and had provided foster parents with services related to C's developmental delays. The services provided to foster parents took place in foster parents' home and involved coaching in strategies designed to help increase C's verbal output and to help her engage in games and "functional play." In contrast, Petersen testified that the primary focus of her work with parents was to help parents understand trauma-based parenting and that it was important for parents' training that parents "recognize[d] and acknowledge[d] that C is displaying trauma [behaviors]."

In regard to parents' ability to recognize trauma behaviors, at one point in their training, Petersen asked parents:

> "Do you believe that she has trauma in her past? And they said, 'Yes.' * * * And they were able to—tell me some trauma behaviors, but—but not all of them. Not all of them in a visit, but I see that they connected the dots to them being trauma behaviors."

However, parents believed that the source of the trauma was DHS, and had nothing to do with their parenting of C.

In January 2014, DHS learned that mother's son was living with parents and opened a child protective services investigation into his conditions. Although DHS began investigating mother's son's conditions at that time, as of the close of the second permanency hearing seven months later, DHS had not attempted to assert jurisdiction over him.

In March 2014, parents filed a motion to stay permanency pending our decision in *J. M.* and a motion to dismiss jurisdiction. That month, the court held a hearing on that motion. During that hearing, parents learned of C's impairments for the first time.

In April 2014, we issued our opinion in *J. M.*, reversing the court's decision to change the plan to adoption and remanding to the juvenile court. 262 Or App at 139. The juvenile court did not conduct further hearings until June 2014. In the intervening month of May 2014, C received a diagnosis of autism spectrum disorder as well as language disorder and global developmental delays. The diagnosing doctors recommended "significant levels of support" and "significant intensive early intervention." The diagnosing doctor testified that early intervention "is correlated with better outcomes"; that without that intervention, C was "very unlikely" to make gains on her own; that "stability and structure" would be helpful for C; and that "it would be important that a care provider accept the need for treatment at a significant and sustained level."

In June 2014, parents began working with a new skills trainer, Vanessa Washington, who was the first service provider to begin working with parents about C's autism spectrum disorder diagnosis and other delays. Washington observed that, between June and July, parents' interactions with C improved. In early June, C had begun waving goodbye to parents and, in late June, Washington noted that, for the first time during the five observed visits that month, "[mother] responded to [C's] emotional responses appropriately and empathetically."

Washington also attempted to discuss C's autism spectrum disorder diagnosis with parents. She noted that mother appeared receptive to receiving information about autism spectrum disorder, but that father did not participate

in those discussions, at times "testing" noisy toys while Washington and mother talked about C's diagnoses.

Throughout the five visits in June, Washington repeatedly encouraged parents to participate in an online training course about autism spectrum disorder. That course is structured in weekly modules. Course participants are intended to do one module a week and apply the skills presented in that module throughout the week and reflect upon the efficacy of those skills the following week. Despite owning a tablet computer and having access to computers at a library across the street from their home, parents did not begin the online class until a week before the July 2014 hearing. In that week, parents reviewed five out of 12 weekly modules. Mother also checked out books about autism spectrum disorder from the library after learning of C's diagnosis.

During May and June 2014, Dr. Joshua Laubacher performed a parent-child relationship assessment that examined C's relationship with parents and foster parents. Laubacher concluded that C had a primary attachment bond with foster parents and explained that "[C's] foster parents have become her *parents* in any psychological meaningful sense of the term." (Emphasis in original.) On the other hand, he concluded that C had a tertiary attachment with parents. He explained a tertiary attachment bond is the sort of bond that children have with "extended family members, teachers, [and] babysitters." Ultimately, Laubacher concluded:

> "By this stage of [C's] development, we have reached a point where any disruption to her primary attachment with her foster parents *will* create an intense amount of stress and possibly longer-term emotional disturbances."

(Emphasis in original.)

In June and July 2014, the juvenile court held further hearings on parents' motion to dismiss jurisdiction filed earlier that year. At the same hearings, the court considered a new motion by DHS to again change the plan to adoption. The court heard medical testimony from doctors who treated C and initially diagnosed the unexplained injury as a bruised cheek and broken tibia resulting from

nonaccidental trauma. A doctor, who did not examine C, testified that the unexplained injury was not the result of nonaccidental trauma, but rather resulted from rickets, which is caused by a vitamin D deficiency.

Additionally, the court heard testimony about parents' participation in services, including testimony that parents had completed an eight-week parenting course; that mother had completed four online self-improvement classes and a course on domestic violence; and that mother voluntarily began individual counseling in March 2013 and was continuing to receive counseling at the time of the hearing in July 2014. Father, on the other hand, attended portions of an anger management course, but did not complete it. In May 2014, while father was still attending those classes, a counselor wrote to parents' DHS caseworker stating that

> "[father] shows good participation and accountability in group. He has completed both his books and turned in all his journals. He is currently working on his accountability statement. However, he missed 3 groups in the past few weeks. Usually we discharge a client if he misses more than 3 classes in 6 months. My understanding is that he has needed to due to work obligations."

Mother testified that father was not formally working during this period of time, although he was doing "informal mechanic work."

After the July 2014 hearing, the court denied parents' motion to dismiss and again changed the plan from reunification to adoption, making detailed oral findings.[3] In regard to the motion to dismiss, the court found that, despite 27 months of involvement with DHS, "there is still no explanation for the child's injuries that concords with the medical evidence" and that "the injuries to the child were either caused by the parents themselves or at a minimum the parent should have known [of] the injuries." Moreover, the court noted that, despite parents' participation in most

---

[3] Following the court's denial of mother's motion for reconsideration in October 2014, the court issued a letter opinion that reiterated the findings made at the conclusion of the July 2014 hearing.

of the services offered, "there has been a resistance to [services], in some cases an actual refusal to actually gain from or learn from the services * * * [and] there has been little progress made in * * * parents' understanding and/or benefiting from the services actually offered." In support of that finding, the court specifically noted that father had not completed his anger management course.

In regard to the change in plan to adoption, the court found that, although DHS's performance in this case was less than exemplary, particularly with respect to its failure to disclose C's developmental delays earlier, "the state has made reasonable efforts" and, "given the circumstances[,] DHS provided the services, made the services necessary." The court also found that parents continued to lack the necessary parenting skills such that a "safe return [could not] take place within a reasonable amount of time," citing, in particular, mother's psychological examination in which the psychologist opined that mother was prone to denial and defensiveness. Consequently, the court concluded that mother was unwilling or unable to adjust her parenting in light of C's needs. The court also relied on C's autism spectrum disorder diagnosis, finding that "this is a child with high needs, and the parents' progress in attempting to meet these needs is simply not sufficient at this time" and that "[father] was not really interested in discussing the autism spectrum disorder condition of this child with the folks at the counseling service center." Additionally, the court found that "[v]isitation is causing more stress on this child rather than actually strengthening the relationship [between C and parents]" and that service providers had opined that "[C] would be emotionally traumatized if she were to leave her foster parents."

## II.   ANALYSIS

### A.   *Motion to Dismiss*

To support juvenile court jurisdiction following a motion to dismiss, the court must find that there is a current threat of serious loss or injury to the child and a reasonable likelihood that the threat will be realized. *Dept. of Human Services v. S. P.*, 249 Or App 76, 84, 275 P3d 979

(2012); *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010). DHS has the burden to prove, by a preponderance of the evidence, that the facts on which jurisdiction is based persist to the degree that they pose a current threat of serious loss or injury that is reasonably likely to be realized. *Dept. of Human Services v. D. A. S.*, 261 Or App 538, 544, 323 P3d 484 (2014). The risk of harm must be nonspeculative and present at the time of the hearing. *Dept. of Human Services v. W. A. C.*, 263 Or App 382, 403, 328 P3d 769 (2014). In deciding whether continued jurisdiction is warranted, the court must "consider all of the facts in the case before it and * * * consider whether, under the totality of the circumstances, the child's welfare is endangered." *Id.* at 394.

When a parent has participated in some services, yet there is concern that the parent has not "internalized" better parenting techniques, the "dispositive question * * * is not what [a parent] believes, but what [that parent] is likely to *do*." *Dept. of Human Services v. J. M.*, 260 Or App 261, 268, 317 P3d 402 (2013) (emphasis in original) (*DHS v. J. M.*). In such circumstances, legally sufficient evidence links the "lack of insight to the risk of harm." *Dept. of Human Services v. A. B.*, 264 Or App 410, 419, 333 P3d 335 (2014). *Cf. Dept. of Human Services v. A. F.*, 243 Or App 379, 387-88, 259 P3d 957 (2011) (a father's possession of pornography alone is not legally sufficient evidence to continue jurisdiction without evidence showing a link between his possession of pornography and a risk of harm).

Mother argues that the fact that parents have not provided an explanation of C's injury that conforms to medical evidence is not, in itself, evidence of a present risk of harm. Mother observes that, unlike in *Dept. of Human Services v. T. R.*, 251 Or App 6, 283 P3d 969 (2012), here there is no expert testimony that it is necessary to know the cause of the child's injuries for parents to make progress in services or for DHS to gauge parents' progress. Indeed, mother notes that the psychologist who performed mother's psychological evaluation testified that it was possible that services would mitigate concerns regarding mother and the psychologist who performed father's psychological

evaluation recommended a transition back to parents' care.[4] Moreover, parents contend that they have ameliorated the risk to C, arguing that, even in light of the juvenile court's finding that each parent either caused the injury or should have known of it, the juvenile court could not have found that parents continued to pose a present reasonably likely risk of serious loss or injury because parents put forth sufficient evidence to compel the opposite finding. Mother argues that this is particularly the case in light of evidence that parents had been parenting mother's son and, as of the July 2014 hearing, the court had not taken jurisdiction over him.

DHS responds that, until DHS knows how C was injured,

> "it is not possible to know how to prevent a similar inflicted injury in the future [and in turn] DHS cannot create a safety plan for [C's] return home because any plan would require oversight by safety supervisors and the supervisors would not know which behaviors or circumstances are concerning."

DHS further argues that the evidence was legally sufficient to support the juvenile courts' finding that parents had not ameliorated the risk.

We agree with DHS that the juvenile court did not err in denying parents' motion to dismiss jurisdiction. However, we reject the categorical approach to unexplained injuries that DHS appears to urge us to adopt because our case law does not support the proposition that there is necessarily an ongoing risk of serious harm any time there is an unexplained injury and DHS asserts that it cannot create a safety plan without knowledge of how the injury occurred. Instead, we conclude that, here, there is legally sufficient

---

[4] Mother also argues that there is no evidence to support the juvenile court's findings that "at a minimum the [nonoffending] parent should have known [of] the injuries" because only parents' expert witness testified that a broken tibia would have necessarily caused lingering pain and swelling and the court credited DHS's experts over parents' expert. We reject that argument without further discussion because, based on the trial court's disposition of the case, it is a permissible inference that the court credited DHS's experts with respect to the cause of the injury, but parents' expert with regard to lingering pain and swelling. *N. P.*, 257 Or App at 639. Consequently, we leave undisturbed that trial court's finding that "the injuries to the child were either caused by the parents themselves or at a minimum the parent should have known [of] the injuries."

evidence in the record for the juvenile court to have concluded that the jurisdictional conditions continued to present a sufficient risk.

As mentioned, mother distinguishes this case from *T. R.*, noting that the record in *T. R.* contained expert testimony stating that without an explanation of the injuries, DHS could not direct services at the specific cause of the abuse and thereby sufficiently reduce the risk. Although mother is correct that there is no such expert testimony in this case,[5] our analysis in *T. R.*, and other cases analyzing unexplained injuries, does not turn on the presence or absence of expert testimony alone.

In *T. R.*, the evidence in the record showed that doctors discovered that parents' approximately three-month-old child had 27 broken bones in various stages of healing. 251 Or App at 8. The parents acknowledged "that they might have been rough with the child" but denied having intentionally caused the injuries. Doctors concluded that the injuries were the result of abuse that occurred while the child was in the parents' care and ruled out any possible medical causes. *Id.* at 9. The child was immediately placed in protective custody, the parents eventually stipulated to several jurisdictional allegations, and the state moved to change the plan from reunification to adoption. *Id.* at 9-10.

Throughout the child's involvement with the state, the parents failed to provide any explanation of the injuries that conformed to medical evidence. However, the parents completed all of the services offered. *Id.* at 9. Psychologists concluded that neither parent had a chronic disorder that would explain the abuse of a child.

At the permanency hearing, the state presented evidence from two psychologists. One testified that it would be "critical to know the causes of the child's injuries" because

---

[5] When discussing its findings, the juvenile court stated:

"One thing I thought was interesting that [parents' expert witness] testified to was that physical injuries need to be explained so that people can understand what happened. We simply don't have that here, parents are willing or unwilling to say what happened."

The record does not support that statement. In fact, none of the doctors involved in the case testified that the "physical injuries need to be explained."

without that knowledge it would be hard to prevent the injuries from reoccurring. *Id.* at 13-14. The other psychologist testified that "[t]here are ongoing concerns about [the father's] ability to safely parent his children until it is determined how [the child] got the injuries." *Id.* at 14. The juvenile court changed the plan to adoption, finding that DHS had made reasonable efforts to reunify the family and that the parents had not made sufficient progress.

We affirmed the juvenile court's decision to change the plan to adoption, reasoning that "the record supports [DHS's] contention that, before services could be directed at the specific causes of the abuse, it would be necessary for the parents [to explain] how the child came to be injured." *Id.* at 14. Thus, aside from expert testimony about the role that parents' admission might play in parents' treatment or in reducing the present risk to the child, the record in *T. R.* also included evidence regarding the nature and extent of the child's injuries, the presence or absence of parents' underlying mental health disorders, and the parents' participation in services. Consequently, our analysis of the legal sufficiency took into account more than the mere presence or absence of the expert testimony. *See also State ex rel Juv. Dept. v. Nguyen*, 182 Or App 294, 48 P3d 864 (2002) (using the same factors to analyze an unexplained injury in the context of a termination of parental rights proceeding); *State ex rel Juv. Dept. v. Nguyen*, 194 Or App 604, 96 P3d 1219 (2004) (same).

Consequently, in answering the question posed by this assignment of error—whether the juvenile court's conclusion that ongoing jurisdiction was warranted is based on legally sufficient evidence—we must look at more than the presence or absence of expert testimony about the role that parents' admission might play in parents' treatment or in reducing the present risk to the child. Instead, we examine the totality of the circumstances. *W. A. C.*, 263 Or App at 403.

The juvenile court found parents' participation in services and the relationship between their participation and their mental health conditions to be of particular importance in its analysis. As noted, the juvenile court found that

"there has been a resistance to [services], in some cases an actual refusal to actually gain from or learn from the services * * * [and] there has been little progress made in * * * parents' understanding and/or benefiting from the services actually offered." In support of that conclusion, the court specifically found that father had not completed his anger management course. The evidence shows that father missed more classes than a participant is typically allowed to miss.

DHS requested that father attend the anger management course because the psychologist who examined father opined that father fell into a particularly well-studied category of people who were likely to engage in unpredictable outbursts and dangerous explosions and gave father a rule out diagnosis of intermittent explosive disorder and a provisional diagnosis of antisocial personality traits. Moreover, in the past, father admitted to engaging in a violent explosion directed at his then seven-year-old daughter. Although the psychologist recommended a slow transition back to parents' care, he testified that the transition should not continue if father showed a lack of measureable progress in his anger management course.

The court also found that neither parent made an "internal change" with regard to their parenting skills. When a court links such a condition to a risk of harm sufficient to warrant continued jurisdiction, the "dispositive question * * * is not what [a parent] believes, but what [that parent] is likely to *do*." *DHS v. J. M.*, 260 Or App at 268 (emphasis in original). There is ample evidence in this record of what parents are likely to do—namely, there is evidence that mother is likely to cover up for father if he engages in a violent explosion directed at C and that parents will fail to provide C with the support required by her autism spectrum disorder and other diagnoses. Moreover, there is sufficient evidence in this record from which to conclude that C would experience serious loss or injury as a result.

The psychologist who evaluated mother opined that mother minimized or denied problem areas and she likely had a "dependant personality." He testified that mother would likely choose to protect her relationship with father over protecting her children from father. He also concluded

that mother's prognosis for treatment was "not good" because of defensiveness and denial.

The record contains evidence that mother has, in fact, made little progress toward learning to implement new and better parental skills. For example, parents' first skills trainer, who began working with parents in December 2013, was surprised by the lack of attachment between C and mother.[6] Parents' second parental skills trainer, who began working with parents in June 2014, noted that only once during her time working with parents did mother respond to C "appropriately and empathetically."

Moreover, C has significant developmental delays, having tested in the first and lowest and second lowest percentile in two developmental categories. Additionally, the doctor who diagnosed her with autism recommended "significant intensive early intervention," testifying that "it would be important that a care provider accept the need for treatment at a significant and sustained level" and that without such intervention is it was "very unlikely" C would make gains on her own.

There is also evidence that neither parent substantially engaged in services or demonstrated substantial concern related to C's special needs. For example, despite knowing of C's special needs for approximately three months and receiving frequent encouragement from their parental skills trainer to engage in autism services, parents did not do so until a week before the July 2014 hearing, and even then they proceeded by reviewing five out of 12 classes in the online course. As noted, those classes are intended to be completed one each week so that course participants can practice and reflect on the skills that they have learned. Father did not engage in any discussions about C's special needs.

---

[6] Mother also argues that parents' resistance to "trauma-based parenting instruction" provided by parents' first parental skills trainer is not evidence that they are "unable to meet C's needs" because C's eventual autism spectrum disorder diagnosis demonstrates that DHS's proffered services "did not accurately address the problems, and * * * parents' resistance may actually have been well-placed." We reject that argument for a number of reasons, chief among them being the undisputed evidence that parents agreed that C had experienced trauma, albeit they believed that the source of this trauma was DHS, and not their parenting of C.

Thus, we conclude that the juvenile court did not err in denying parents' motion to dismiss in light of evidence in this record regarding parents' failure to substantially benefit from the services they engaged in; parents' mental health conditions; father's failure to follow through with services related to his condition; mother's poor prognosis; and C's special needs and parents' failure to engage in services related to those needs during the three months in which they were aware of those special needs. We so conclude because that evidence is legally sufficient to support the juvenile court's conclusion that both jurisdictional conditions posed a present, reasonably likely risk of serious loss or injury. *S. P.*, 249 Or App at 84; *C. Z.*, 236 Or App at 440.

In so concluding, we also reject mother's argument that the fact that DHS had not petitioned the court to take jurisdiction over mother's son, whom parents had been parenting for approximately six months at the conclusion of the second permanency hearing, demonstrates that the juvenile court erred in finding that this jurisdictional condition continued to present a sufficient risk. The record does not contain evidence, nor has mother asserted, that mother's son has special needs. Thus, evidence related to parents' brief time parenting mother's son is not so significant as to compel a finding.

B.  *Change of Plan*

When the permanency plan at the time of the hearing is reunification, to change the child's plan away from reunification, DHS bears the burden to show by a preponderance of the evidence that (1) it made reasonable efforts to reunite the family; and (2) despite those efforts, the parents' progress was insufficient to make it possible for the child to return home safely. ORS 419B.476(2)(a); *see Dept. of Human Services v. S. T.*, 240 Or App 193, 195, 248 P3d 427 (2010) (applying preponderance-of-evidence standard in a case involving change in permanency plan). In making such a determination, "the court shall consider the ward's health and safety the paramount concerns." ORS 419B.476(2)(a).

When a juvenile court is assessing DHS's efforts toward reunification, "[t]he ultimate question [is] whether

DHS's efforts have been reasonable under the circumstances," and, "in answering that question, a court must consider the *totality* of the circumstances[.]" *Dept. of Human Services v. M. K.*, 257 Or App 409, 417-18, 306 P3d 763 (2013) (emphasis in original). "[A] court making a 'reasonable efforts' determination must consider not only the burdens that the state would shoulder in providing those services, but also what benefit might reasonably be expected to flow from them." *Id.* at 416.

We begin with the juvenile court's determination that DHS made reasonable efforts to reunify parents with C. Parents argue that the evidence is not legally sufficient for the court to have concluded that DHS's efforts were reasonable because DHS delayed for six months in informing parents and parents' service providers about C's testing related to her developmental delays. In support of that position, mother argues that, "once mother received accurate information about C, the changes in the relationship were dramatic" and observes that a parental skills trainer noted that "[C] continues to greatly improved [*sic*] in her emotional dysregulation" in the month before the July 2014 hearing.[7] DHS responds that "the record supports an inference that earlier information would not have made a difference." We agree with DHS.

In making its determination that DHS's efforts were reasonable, the juvenile court was required to consider "what benefit might reasonably be expected to flow" from the services that DHS failed to provide, *M. K.*, 257 Or App at 416, which on these facts would have included services related to C's developmental delays such as those that it provided to foster parents. Parents learned of C's diagnoses

---

[7] We also understand mother to argue that, because parents were not "on notice until shortly before the hearing that [parents] needed to learn about [C's] developmental delays and autism," DHS's efforts were not reasonable. We reject that argument because the jurisdictional allegation that parents' lack of parenting skills made them unable to provide minimally adequate care for C was sufficient to put parents on notice that they were required to develop the skills necessary to care for C. C's diagnosis does not change that requirement. *Cf. Dept. of Human Services v. R. B.*, 263 Or App 735, 747, 329 P3d 787 (2014) (holding that an allegation involving the mother's impulsive behavior and inability or unwillingness to control her behavior put the mother on notice that she needed to address underlying mental health problems).

of developmental delays in March 2014. The permanency hearings in this case did not conclude until July 2014. In the interim, parents' parental skills trainer attempted to engage with parents about C's diagnosis and encouraged them to begin a course about autism spectrum disorders. As discussed above, 275 Or App at 446, the evidence shows that parents did little to engage with the parental skills trainer and did not begin the autism spectrum disorders course until a week before the July 2014 hearing, and then did not engage with that program appropriately. Consequently, the juvenile court had evidence specifically tied to parents' willingness and ability to participate in services related to C's special needs before it, in addition to evidence about parents' participation in other services from which it could infer that parents would have gained little from six months of additional services targeting C's special needs.

Moreover, although mother characterizes the changes in C's interactions with parents following DHS's disclosure of C's diagnoses as dramatic, the evidence was sufficient for the juvenile court to conclude the opposite. For example, the same parental skills trainer whom mother quotes noted that only once in five of the one-and-one-half hour visits sessions did mother respond to C "appropriately and empathetically." To be sure, the trainer noted that mother's one appropriate and empathetic response represented progress. However, that progress is not so overwhelming as to compel the finding that DHS did not make reasonable efforts in light of changes in C's interactions with parents following DHS's disclosure.

Additionally, the court noted that, in deciding to change the plan to adoption, it was considering C's health and safety as its paramount concern as is required by ORS 419B.476(2)(a). In that vein, the court found that "[v]isitation is causing more stress on this child rather than actually strengthening the relationship [between C and parents]" and observed that service providers had opined that "[C] would be emotionally traumatized if she were to leave her foster parents."

Consequently, we conclude that the juvenile court's finding that, despite DHS's six-month delay in disclosing C's

developmental delays, DHS's efforts at reunification were reasonable and supported by legally sufficient evidence.

Additionally, we conclude that there is legally sufficient evidence to support the juvenile court's finding that parents' progress was insufficient to make a safe return to parents' care possible. We reach that conclusion for the same reasons that we held that the court did not err in concluding that parents' lack of parenting skills and failure to provide an explanation of the injuries that comported with medical evidence warranted continued jurisdiction, 275 Or App at 440-47.

## III. CONCLUSION

In sum, we hold that the juvenile court did not err in denying parents' motion to dismiss jurisdiction because the evidence is legally sufficient to support the conclusion that the jurisdictional conditions posed a present, reasonably likely risk of serious loss or injury. *S. P.*, 249 Or App at 84; *C. Z.*, 236 Or App at 440. We also hold that the juvenile court did not err in changing the plan from reunification to adoption because the court's finding that DHS made reasonable efforts to reunify the family and that parents' progress was insufficient to make it possible for the child to return safely home is supported by legally sufficient evidence. ORS 419B.476(2)(a). Accordingly, we affirm.

Affirmed.