Argued and submitted October 29, affirmed December 30, 2020, petition for review denied March 4, 2021 (367 Or 668)

In the Matter of A. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. L.,
*Appellant.*

Marion County Circuit Court
19JU03181; A174263

479 P3d 1092

Mother appeals from a judgment denying her motion to terminate wardship and dismiss dependency jurisdiction over her deaf teenaged daughter, A. The juvenile court asserted jurisdiction over A on the grounds that mother (1) physically assaulted the child and (2) had anger and impulse control problems. Mother argues that the Department of Human Services (DHS) did not meet its burden to establish that (1) the adjudicated bases for jurisdiction still existed at the time of the motion hearing and (2) that they continued to pose a serious risk of harm to A. DHS relies on mother's continued impulsivity, her minimization of the impact that the original assault had on A, and her breach of the in-home safety plan to argue that the court did not err in denying her motion. *Held*: The juvenile court did not err. The record supported the court's determination that the adjudicated bases for jurisdiction continued to pose a serious risk of harm to A, and that the harm was likely to be realized.

Affirmed.

Heidi O. Strauch, Judge pro tempore.

George W. Kelly argued the cause and filed the opening brief for appellant. D. L. filed the supplemental brief *pro se.*

Adam Holbrook, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Affirmed.

**MOONEY, J.**

This juvenile dependency case concerns A, a deaf teenager, and her mother, a hearing adult. It is the second time the case has been before us. The first was an appeal from the judgment of jurisdiction where we concluded that the record, though not compelling, was sufficient to have allowed the juvenile court to assert jurisdiction over A on the grounds that mother (1) had physically assaulted A and (2) had anger and impulse control problems, which interfered with her ability to safely parent A. *Dept. of Human Services v. D. L.*, 303 Or App 286, 290, 462 P3d 781, *rev den*, 367 Or 257 (2020).

Mother now appeals from the juvenile court's order denying her motion to terminate wardship and dismiss dependency jurisdiction. She assigns error to the court's denial of her motion, particularly its finding that it is "'reasonably likely' that a return to mother's home will cause [A] to suffer additional physical harm." Mother argues that, during the months that passed between jurisdiction and the hearing on her motion,[1] she engaged in services, had a successful three-month in-home trial reunification with A, and did not again assault A. The Department of Human Services (DHS), she argues, did not meet its burden to establish that the bases for jurisdiction still existed at the time of the hearing, and it did not establish that those adjudicated jurisdictional bases continued to pose a serious risk of harm to A. DHS disagrees. It argues that mother continued to exhibit "anger and impulse control problems" and that she breached the in-home safety plan put into place for the trial reunification by attempting "to physically force [A] into a darkened room at church." Moreover, DHS argues that mother's disruptive conduct in court provided additional evidence of her continued impulse control problems and that the juvenile court did not err in denying her motion. We affirm.

Mother does not request *de novo* review and, given that this is not an exceptional case, we will not exercise our

---

[1] Jurisdiction was established by judgment entered on September 3, 2019. Mother filed her motion to terminate wardship on January 24, 2020, and the hearing on that motion occurred over the course of three days on March 5, April 28, and June 25.

discretion to do so. ORS 19.415(3)(b); ORAP 5.40(8)(c). We view the evidence, as supplemented and supported by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and we assess "whether the evidence was sufficient to permit the challenged determination." *Dept. of Human Services v. J. E. F.*, 290 Or App 164, 166-67, 421 P3d 415, *rev den*, 362 Or 794 (2018); *Dept. of Human Services v. C. P.*, 281 Or App 10, 18, 383 P3d 390 (2016). We state the facts, drawn from the testimonial and documentary evidence received at the hearing, according to that standard.

In late April 2019, mother assaulted A by throwing a heavy wooden stool at her, causing significant pain and a black eye. A was traumatized by the assault and she experienced related nightmares after that. Prompted by a report of that assault, DHS removed A from her mother's home and initiated this dependency case. The juvenile court placed A in the temporary custody of DHS and continued her out-of-home placement in shelter care. In August 2019, following a factfinding proceeding, the juvenile court asserted dependency jurisdiction over A and made her a ward of the court. It committed A to the legal custody of DHS, continued her out-of-home placement in foster care, and ordered mother to engage in (1) individual counseling as well as joint counseling with A, (2) "hands-on parenting services once in-home plan is deemed appropriate at DHS discretion," and (3) a psychological evaluation.

In November 2019, A was returned to her mother's home for a trial reunification under the terms of an in-home safety plan, to which mother agreed. Among other things, the in-home safety plan provided that mother would not use "any form of physical discipline" and that she would give A "space" when A was upset. The trial reunification went reasonably well until mid-February 2020, when an incident occurred at church resulting in A's removal from mother's home. DHS characterizes the incident as "physical discipline" and, therefore, a breach of the in-home safety plan. Mother disagrees with that characterization. Because the church incident was key to the juvenile court's denial of mother's motion, we now turn to it in some detail.

A reported that her mother became upset with her at church because A "was not doing as she was told," and that mother grabbed her arm hard enough to leave a bruise. The DHS caseworker followed up the next day by contacting A at school and speaking with mother by phone. They each recounted that mother wanted A to attend a young women's meeting at the church while mother volunteered there that evening. Mother indicated that A did not usually like to attend those meetings but that she had agreed to go that night. A said that she was really not "in the mood" to go because she was always the only deaf person there. When they opened the door to the meeting, the room was dark, and the participants were holding glow-in-the-dark sticks while engaged in a group activity. The details given to the caseworker of what happened next varied slightly but reduce to this: A changed her mind about attending the meeting when she saw the dark room. She is deaf and communicates using American Sign Language (ASL), a visual language that necessarily requires enough light to see. Mother took firm hold of A's arm, tried to guide her into the room, kissed her head, and attempted to give her a "bear hug." A became upset, broke away from mother's grasp, and ran into the bathroom. She did not attend the meeting, instead remaining in a bathroom stall. A developed a bruise on her arm as a result of the incident; the bruise was photographed by the caseworker the next day. A was then removed from mother's home.

At the hearing on mother's motion to terminate wardship, A described the incident:

> "[Mother] wanted me to come in the gym, and I really didn't want to but then she was kind of getting mad and that's when she grabbed ahold of me and gave me a kiss on the head and then she grabbed my arm and pulled me into the gym and was kind of trying to guide me in there, and then I broke free of the grab on my arm and ran off because I didn't want to go in the gym."

Mother also testified about the incident:

> "I volunteer on Wednesdays, I clean the chapel, and at Wednesday nights is when they have the young women's group ***, and I ask her generally, now if she wants to

come or if she doesn't want to come, she hasn't wanted to come since she's been home, she did come a few times, but she didn't want to participate in the girls group, so she sat with me in the chapel while I cleaned the chapel. This time I had asked her if she wanted to come and she said, 'Yes, I'll go,' so it was really, I was really happy about that because I, I want her to have that opportunity to engage in the church activities, to me it's something that's really important and close to my heart, and so I was happy that she wanted to come and we came inside, that night was going to be a very special night to where they had glow-in-the-dark lights and sticks and to kind of symbolize when you're in the dark or you don't know what to do, you can kind of look for the good and try to follow the light of Jesus, and so that was the lights were, the lights were off, and it was like a glow-in-the-dark volleyball game, so it was a fun activity, and at night in her room she has glow-in-the-dark stars and we have the moon and the, the astrology, glow-in-the-dark stars on the walls and then she has the, the different colored lights because, being deaf, it's not fun to be in total darkness, so we have the lights and she really likes the glow-in-the-dark lights and so I thought she would particularly like this one, and so I opened the door and she was standing next to me and then she freaks out, she freaks out, *** she became fearful and didn't want to go into the gym or participate in the activities, and so I just gave her a hug and a kiss and let her go to let her know I'm, I'm—you're okay with me, whatever you choose to do is fine, I'm here to support you, she ran off crying into the bathroom, she locked herself in the bathroom ***."

During the course of the hearing, mother repeatedly interrupted the proceeding and was redirected by the court more than a dozen times. The following exchanges are examples of those interruptions:

"[DHS's COUNSEL]: Isn't the reason you've only had one visit because she didn't want to visit you the other times?

"[MOTHER]: Isn't the reason perhaps why she didn't want to is because people were made to believe that I injured her arm when that's not true?

"[DHS's COUNSEL]: I actually get to ask you the questions and you get to answer them.

"THE COURT:   And so—

"[MOTHER]:   But I'm not going to speculate—

"THE COURT:   Hold on, hold on—

"[MOTHER]:   —on her mindset—

"THE COURT:   Hold on, hold on, stop—

"[MOTHER]:   —that's not appropriate for me either—

"THE COURT:   Stop. Okay? I understand that you're upset, but if I say stop, you need to stop * * *.

"* * * * *

"[A's COUNSEL]:   You didn't say that at the shelter hearing last time we were in court?

"[MOTHER'S COUNSEL]: Objection, Your Honor, we've already just done this * * *.

"* * * * *

"[MOTHER]:   I think that he's taking—

"THE COURT:   Oh—

"[MOTHER]:   —things way out of—

"THE COURT:   —stop.

"[MOTHER]:   —context. Oh, sorry—

"THE COURT:   It's not your turn—

"[MOTHER]:   I forgot I'm on the mike [*sic*], sorry."

And, later, when Rojas, a DHS caseworker, was testifying, mother continued to interrupt:

"ROJAS:   Yeah, ultimately [mother] said that she had asked [A] to do the laundry and [A] said no and then [A] threw the mirror at [mother] and [mother] said that she may have kicked [A] near her backside and she may have tapped her on the side to get her attention and [mother] described being angry and throwing an object towards [A], causing a black eye.

"[MOTHER]:   I did not—

"ROJAS:   —and that she didn't mean to hurt her.

"THE COURT: So, [mother], you're not allowed to interrupt testimony. If your lawyer thinks there's a reason for a legal objection, she can do that, but right now someone else is under oath and is testifying. Do you understand?

"[MOTHER]:   Yes. She's perjuring herself, though.

"THE COURT:   Okay, [mother]?

"[MOTHER]:   I won't speak anymore, I apologize."

The juvenile court made the following findings concerning credibility, the incident at the church and mother's conduct during the course of the hearing:

"1. Mother's testimony lacks credibility: [Mother] testified that she had historically lied to get the outcome she desired for [A's] placement with her and throughout her testimony she consistently minimized her role in creating an unsafe environment for [A], denying any assaultive behavior and any resulting trauma to the child.

"2. The child's testimony is credible: [A] was thoughtful in her responses, descriptive, and her responses were measured—she avoided clear opportunities to exaggerate to get what she wanted.

"3. During the trial reunification, mother violated the in-home safety plan by using physical discipline: [Mother] and [A] were at their church when mother opened a door to a large room where a youth group was playing a game in the dark. [A] didn't know what the activity was until the door opened in front of her to the dark room. [A] pulled back and tried to tell her mother that she did not want to participate (because [A] is deaf, in the dark room she would have been cut off from all communication except by touch) and [mother] attempted to physically force [A] by pulling her into the dark room, grabbing her arm and giving her a full body hug. [A] testified that her arm hurt from the grab. ([A] broke away from her mother's hold and ran to the bathroom, where she locked herself in a stall. She testified that when her mother grabbed her she flashed back to the incident that precipitated her removal by DHS and thought her mother was going to hit her again.)

"* * * * *

"6. Mother's impulsivity and difficulty in controlling herself was evidenced in court during the hearing, with

verbal outbursts and body language gestures in response to testimony or statements in court. ([Mother] also attempted to communicate with [A] via sign language on the first day of hearing but stopped after the court advised [mother] that the hearing would be stopped and any communication would be interpreted verbally into the record by the ASL interpreter if she continued.)"

Under ORS 419B.100(1)(c), jurisdiction is proper over a child "[w]hose condition or circumstances are such as to endanger the [child's] welfare." A child's welfare is endangered when the child "is exposed to conditions or circumstances that present a current threat of serious loss or injury." *Dept. of Human Services v. E. M.*, 264 Or App 76, 81, 331 P3d 1054 (2014) (internal quotation marks omitted). In assessing whether jurisdiction is proper, we look to the totality of the circumstances to determine whether there is a reasonable likelihood of harm to the welfare of the child. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010). DHS bears the burden of proving that a risk of serious loss or injury is present and nonspeculative at the time of the hearing and that there is a causal link between the parent's risk causing conduct and potential harm to the child. *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 62, 308 P3d 307 (2013).

Where, as here, jurisdiction is established, and the permanency plan remains reunification, DHS continues to bear the burden of demonstrating that the original bases for jurisdiction have not been ameliorated and that they continue to pose a threat of serious loss or injury to the child. *Dept. of Human Services v. T. L.*, 279 Or App 673, 687, 379 P3d 741 (2016). We evaluate motions to dismiss ongoing jurisdiction using a two-tiered approach. We first determine whether the adjudicated bases for jurisdiction continue to pose a threat of serious loss or injury to the child, and, if they do, we then assess the likelihood that the risk of loss or injury will be realized in the absence of juvenile court jurisdiction and wardship. *Dept. of Human Services v. N. L. B.*, 306 Or App 93, 99, 473 P3d 610, *rev den*, 367 Or 220 (2020). The task is not to relitigate the original allegations. Instead, the focus is on whether the adjudicated bases for jurisdiction continue to support jurisdiction. DHS must establish

that the threat of harm from those adjudicated allegations remains current and nonspeculative. That requires something more than evidence of past danger. *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012). And, of course, "there must be a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011).

The jurisdictional bases adjudicated in 2019 include (1) mother's assault of A in April 2019 and (2) mother's anger and impulse control problems. DHS argues that jurisdiction continues to be warranted because mother "continued to exhibit anger and impulse control problems and violated the in-home safety plan by physically disciplining and harming [A]." DHS relies on the incident at church as the prohibited "physical discipline" that constituted the breach. In reference to that event, the juvenile court concluded that mother "attempted to physically force [A] by pulling her into the dark room, grabbing her arm and giving her a full body hug." We understand DHS's argument to be that there was evidence from which the juvenile court could have concluded that mother's impulsivity and anger is ongoing and that the incident at the church demonstrates that A remains at risk of significant loss or injury. We agree. Viewing the evidence in the light most favorable to the juvenile court's decision, we conclude that the record supports the court's determination that A continued to be at risk of serious harm. The incident at the church, considered in the context of mother's demonstrated anger and impulse control issues, logically leads to the conclusion that the risks associated with the 2019 assault have not been ameliorated.

We note that jurisdiction is not based upon mother's lack of parenting skills—either in general or specific to the needs of a profoundly deaf child. Nevertheless, the record reflects significant focus on A's needs as a deaf child. We do not doubt that raising a deaf child presents challenges for a hearing parent that would not be present when raising a hearing child. But DHS did not allege—and the juvenile court did not find—parental deficiencies on mother's part relative to A being deaf. And, while the ongoing DHS caseworker, Peters, testified that she learned that it is a form

of abuse to "force someone who is deaf into a hearing situation that they do not want to go into," that testimony does not support continued wardship based upon an adjudicated jurisdictional basis. However, evidence concerning deaf culture and A's needs and desires as a deaf person certainly provide relevant context for evaluating A's circumstances and interactions. But the ultimate inquiry must focus on the existing bases of jurisdiction and the continued likelihood of serious loss or injury to A because of those bases.

We note also that jurisdiction is not based upon inappropriate disciplinary practices or techniques. Mother's agreement to abstain from physical discipline was in the context of the in-home trial reunification plan. Such a plan is, by its nature temporary, limited to the context of the trial reunification.[2] It is not at all clear, even when viewing the evidence in the light most favorable to the juvenile court's disposition, that the incident at church was "physical discipline." Assuming, however, that the incident was physical discipline—and therefore a breach of the in-home plan— that fact alone is not sufficient to demonstrate that A continues to be at risk of the kind of violent assault that is the basis for jurisdiction. It is the character of the conduct that actually occurred and not its description as "physical discipline" that, in combination with mother's continued impulsivity, supports continued jurisdiction.

Mother argues that she has engaged in the services required of her and that she has ameliorated the reasons for jurisdiction. "We have previously observed that one important measure of whether a risk is likely to be realized is whether parents have taken steps to ameliorate the original bases for jurisdiction." *N. L. B.*, 306 Or App at 100. The DHS caseworker testified as follows regarding mother's engagement in court-ordered services:

"Q. And had [mother] engaged in services?

"A. She had, yes—

"Q. Okay. And what services were those?

---

[2] Reasonable physical force used by a parent to discipline a child is not unlawful, ORS 161.205(1)(a), and state policy protects a parent's liberty interest in raising his or her children, including the use of reasonable discipline, ORS 419B.090(4)(c).

> "A.   So she continues to still do some of these, she does ASL classes through Brianna Gary (Phonetic), who is a certified—basically she does ASL. She took a parenting class.[3] She completed a psych eval, which we recently got the results of that. And she, she reports to being in counseling, but I don't have access to that piece.
>
> "Q.   Is that because [mother] testified that she declines to sign a release of information for you to talk with her counselor, correct—
>
> "A.   That's correct, yeah."

DHS argues that mother's counseling is not properly focused on ameliorating the jurisdictional bases and that mother's failure to provide a release to enable DHS to contact her therapist makes it impossible for DHS to ensure the proper focus and to arrange for joint counseling for mother and A. At the same time, there was no evidence that DHS referred mother to a counselor and, with respect to A, there was a prolonged delay in referring her to a counselor. DHS began searching for a counselor for A in June 2019, but that proved challenging because it was important to A to have a counselor with whom she could directly communicate through ASL, rather than having a third-party interpreter involved. The caseworker explained that process as follows:

> "A.   Okay. So in June of 2019 we started to look for a therapist and actually her foster parents were working really hard as well to find someone. [A] made it really clear that she did not want a third party, she wanted someone that she could talk to and they could do ASL back and forth, which—so that, that was hard because we found—we finally found someone, let me see, his—through the Lighter Heart, but he does not—but he did not take OHP, so we were trying to get him on a contract with DHS, and DHS was actually willing to pay for that service outside, but it had to do with an insurance piece that I don't quite understand, so between I want to say all through August into September I was going back and forth.
>
> "My agency also had me make several efforts to find a counselor out—that took the OHP, there was no one that was available. We—Brad Houck (Phonetic) was not, also not available, who later he said he was available and so we

---

[3] Mother was not ordered to participate in ASL or parenting classes.

worked, that was closer to now March of '20, we were trying to get Brad, finally, but there was also an issue because he didn't take Pacific Source and that switched January 1st—

"Q.   Okay.

"A.   —so finally Johnnie Burt is now who [A] is seeing, but it, it took a while for that to start, she's been seeing her for, I would say, a month or so."

While DHS was trying to negotiate a contract and work out insurance logistics for A's counselor—which was a prerequisite to joint counseling—mother underwent a psychological evaluation in November 2019. Mother did not use the referral from DHS for a psychological evaluation. However, mother did obtain a psychological evaluation on her own and the DHS caseworker testified that she received a copy of the report and thought it would require only minimal follow-up:

"Q.   You mentioned a psychological evaluation that you reviewed, correct?

"A.   Correct.

"Q.   Is that—do you feel like that piece of the dispositional order is fulfilled then or do you need more information?

"A.   I would like more information about it, but I don't believe that [mother] would have to do a psych evaluation over again, I think the work she put in was appropriate, I would just like to send a letter to Dr. Freed.

"Q.   Did you say Dr. Freed?

"A.   Yes.

"Q.   And is that the psychologist who performed the psychological evaluation?

"A.   Yes, it is.

"Q.   And what do you mean send a letter to Dr. Freed?

"A.   So generally when DHS asks a parent to do a psych eval, they do a referral-type process where we send information about the case, but then we also would send a referral letter, and at the end of the letter we always have about, you know, five or six questions that we want the

psychologist or psychiatrist to address in their letter, and so the, the psych eval was like a typical psych eval I would have seen from another parent, so I felt like, you know, it covered all of what we'd be asking for, I would just like an addendum where I would reach out to the psychologist and then he could write an addendum to the psych eval.

"Q.   And what would be the purpose of the addendum?

"A.   It would be to give him updated information because the psych eval was taken in November of 2019 and a lot has happened since that time—

"Q.   And are you wondering what services Dr. Freed would recommend, is that—

"A.   That would be—

"Q.   —just one—

"A.   —one of my questions."

DHS did not call Freed as a witness and did not offer his report into evidence. When mother offered the report, the court sustained DHS's objection to its admission and, thus, it is not in the record before us.

The evidence certainly supports the conclusion that mother distrusts DHS and that her compliance with court orders has been reluctant. Given our conclusion that DHS failed to use reasonable efforts earlier in the case, that distrust is understandable. *D. L.*, 303 Or App at 291. But mother has engaged in services. And it is certainly true that a parent's failure to cooperate with DHS or to fully comply with the court's orders alone does not permit continued jurisdiction. *Dept. of Human Services v T. D. G.*, 301 Or App 465, 476, 455 P3d 591 (2019). However, this is not a case where DHS argues that the sole basis for continued jurisdiction is mother's suboptimal cooperation. Instead, her reluctant cooperation and engagement was evidence that the court was entitled to view in its assessment of the current level of risk to A.

"When a parent has participated in some services, yet there is concern that the parent has not 'internalized' better parenting techniques, the 'dispositive question' * * * is not what [a parent] believes, but what [that parent] is likely

to do." *Dept. of Human Services v. J. M.*, 275 Or App 429, 441, 364 P3d 705 (2015), *rev den*, 358 Or 833 (2016) (quoting *Dept. of Human Services v. J. M.*, 260 Or App 261, 268, 317 P3d 402 (2013) (alterations in the 2015 case)). "In such circumstances, legally sufficient evidence links the 'lack of insight to the risk of harm.'" *Id.* (quoting *Dept. of Human Services v. A. B.*, 264 Or App 410, 419, 333 P3d 335 (2014)).

Here, mother's lack of insight is related to the ongoing risk of harm. The court was entitled to rely on mother's courtroom conduct in its assessment of her credibility. And it was entitled to consider mother's continued minimization of the original assault and the new incident in determining the current likelihood that A will suffer serious loss or harm if wardship is terminated.[4] Mother's continued minimization of those events is evidence of a lack of insight. Her lack of insight, in turn, supplies a link between the adjudicated bases of jurisdiction and the incident in the church and her continued impulsivity. *A. B.*, 264 Or App at 419. That link, therefore, permits the juvenile court's conclusion that the risk of harm is reasonably likely to be realized without continued wardship.

The evidence that was before the juvenile court is more compelling now than it was when jurisdiction was established. While the original assault is more remote in time, there was another incident between mother and A that resulted in harm to A, including pain and bruising. The record supports the juvenile court's determination that the need for wardship on the adjudicated jurisdictional bases continues. It did not err.

Affirmed.

---

[4] We have explained that a parent's lack of insight into his or her past endangering conduct "can be a basis for continued jurisdiction only if there is evidence that [that lack of insight] makes it likely that the parent will engage in the conduct again." *Dept. of Human Services v. L. C.*, App 731, 743, 343 P3d 645 (2014). Here, there is evidence that mother's failure to acknowledge the consequences of her past conduct will likely result in future harm to A. Mother physically harmed A and left a bruise while they were still in the midst of an in-home trial run at reunification. One permissible inference is that mother's minimization of her past and present actions poses a significant barrier to A's safe return home.